[L. A. No. 24457.   In Bank.   Oct. 31, 1958.]

M. C. NELSON et al., Appellants, v. C. H. REISNER,
Respondent.

Albert Picard, Mack, Bianco, King & Eyherabide, Burton M. Greenberg and D. Bianco for Appellants.

Hackett & Hubbard, Ralph B. Hubbard, Borton, Petrini, Conron & Brown, George A. Brown and James Petrini for Respondent.

CARTER, J.—Plaintiffs, M. C. Nelson and W. K. Dunne, brought an action for damages and an accounting against defendant, C. H. Reisner. Reisner cross-complained for damages. The trial court gave judgment for Reisner on plaintiffs'

complaint and in his favor for $30,643[1] on his cross-complaint. Plaintiffs appeal from the judgment.

Plaintiffs were the owners of certain real property in Kern County. On June 17, 1947, plaintiffs, as lessors, entered into a written lease agreement with one Henry Schnaidt, whereby 160 acres were leased to him under what was called a "development lease." On February 1, 1949, plaintiffs leased another 160 acres to Schnaidt under a written lease known as a "sharecrop lease." On December 29, 1950, Schnaidt, in consideration of $28,000 paid to him by defendant, by written agreement assigned the development and sharecrop leases to defendant. Plaintiffs consented to this assignment in writing. On or about January 4, 1951, plaintiffs in writing extended the terms of these leases to December 31, 1952, with a reasonable time thereafter in which to harvest and remove any crops which might be growing on the property at the time. Defendant went into possession of the real property in the spring of 1951 and remained in possession until approximately April 5, 1953.

During Schnaidt's possession of the real property as lessee he constructed a dirt reservoir on the acreage covered by the development lease. Plaintiffs sought damages from defendant for the failure to remove this reservoir. Damages were also sought because of defendant's alleged failure to cultivate the real property in a good and farmerlike manner, and for double cropping the land subject to both the development and sharecrop leases.

Plaintiffs' second cause of action was for an accounting concerning the rental agreed to be paid under the sharecrop lease. Under the terms of said sharecrop lease plaintiffs were to receive from defendant one-fifth of the gross returns of the cotton and cotton seed and one-sixth of the gross returns of the potatoes raised on the 160 acres covered by said lease. As heretofore noted, damages were also sought because of defendant's alleged double cropping of the land.

Defendant's cross-complaint was for damages for the violation of Paragraph 13 of the development lease by plaintiffs. This paragraph provided: "Lessors covenant and agree to extend to Lessee *the right of first refusal* in the event of the sale of the premises during the term of this lease and *the right*

---

[1]The judgment was amended by reducing the judgment in the amount of $2,626.27. This sum was represented by two of defendant's checks which were in plaintiffs' hands at the time of trial but uncashed by them.

*of first refusal of a new lease* at the expiration of the term of this lease.'' (Emphasis added.)

Although plaintiffs' briefs appear to be an attempt to re-argue the evidence introduced at the trial and to set forth the portions thereof most favorable to them, their primary contention undoubtedly is that the evidence does not support some of the findings of the trial court.

The court found that Schnaidt constructed the reservoir with the consent of the plaintiffs; that it was an improvement; that it was not improperly constructed; that it did not constitute a nuisance; that defendant did not agree to remove the reservoir; and that plaintiffs were not damaged by any conduct of defendant with respect to the reservoir. The record shows that Schnaidt constructed the reservoir with plaintiffs' knowledge but that he ceased using it when he found he could not get sufficient pressure; that defendant, at plaintiffs' request, used certain dirt from the reservoir to fill in other land when other dirt was more accessible. There is nothing in the record to show that defendant ever agreed to remove the reservoir from the property or that it was ever used by him.

■ While the evidence is conflicting as to whether or not the reservoir constituted an improvement, the resolution of that conflict was for the trier of fact who considered the facility for the storage of water in that vicinity an improvement under the terms of the development lease. The development lease made no provision for the removal of improvements but on the contrary expressly provided that such improvements should be left upon the property.

■ Plaintiffs argue that defendant did not cultivate the real property in a good and farmerlike manner. The court found that ''At all times referred to in the complaint and cross-complaint on file herein, defendant tilled and cultivated the real property subject to said development and sharecrop leases in a good and farmerlike manner. The defendant double cropped portions of said property subject to said leases with potatoes, which was done by defendant in a good and farmerlike manner and in accordance with the custom and practice prevailing in the community where the said property is located, and no damage or destruction of said real property resulted therefrom. The said real property was not damaged or destroyed or deteriorated as a result of said double cropping so as to prevent replanting for five years or for any period whatsoever or at all as a result of defendant's conduct or activities with respect to double cropping said real property

or with respect to his occupancy and use of said real property." On this point, also, the evidence is conflicting. The record shows that double cropping potatoes was apt to result in scabby (diseased) potatoes; that it was, however, done in the vicinity. The record further shows that Smith, defendant's successor on the land in question, had a good yield from his potato crop. There was evidence that defendant worked and "gyped" (gypsum) the soil; that he applied fertilizers and insecticides; that he followed the advice of those experienced in the care of soil; that he raised good seed. There was evidence that he allowed a ditch to become overrun with weeds and willows; and evidence that perhaps he had not worked the soil as deeply as he should have.[2] Inasmuch as we are here concerned, not with the weight of the evidence, but with whether the evidence supports the findings of the court, we cannot say, as a matter of law, that there is no evidence that the defendant used good and farmerlike methods.

Concerning the "right of first refusal" clause which was contained only in the development lease, the trial court found: "Prior to the termination of said development lease, as extended as aforesaid, plaintiffs were informed by defendant, and plaintiffs at all material times, including on February 20, 1953, knew that defendant desired and intended to make a new lease with plaintiffs for the said property subject to said lease at the expiration of said lease with the term thereof as extended as aforesaid, and that he intended to claim and exercise his rights under said right of first refusal clause in the event that plaintiffs desired and intended to make a new lease on said property upon the expiration of said development lease, as extended."

█ Under a first refusal clause the right to a new lease is conditioned upon the lessor's willingness to rent the property. (*Falkenstein* v. *Popper*, 81 Cal.App.2d 131, 137 [183 P.2d 707].) In *Barling* v. *Horn* (Mo.), 296 S.W.2d 94, 97, a clause providing that "the Lessees shall have the first opportunity to purchase the premises" was involved. The court there held that "The clause 'd' did not amount to a contract of purchase and sale; and the clause was not an option to purchase in a true sense; although some courts speak of similar clauses as 'options.' But the clause did amount to a contract or agreement of another kind. It was an agreement that if defendants

---

[2]On the other hand there was evidence that he had ripped the soil to a depth of 25 inches to break up the "hard pan."

Horn decided to sell, plaintiffs were to have the first right to buy,—— the first opportunity to purchase—to the exclusion of a purchase by another—a right of pre-emption, one might say. The agreement, so considered, was supported by a consideration—the lessees' covenants in the contract of lease. The right was peculiarly a valuable one to these plaintiffs because, deprived of it, plaintiffs, upon a sale to another, lost their opportunity to purchase and also lost their option privilege to renew the lease for the further term of five years on the same terms and conditions as those of the current five-year term.

"This court has recognized a distinction between an option to purchase and a right of pre-emption in *Beets* v. *Tyler*, 365 Mo. 895 [290 S.W.2d 76, 81], quoting from Vol. VI, American Law of Property, § 26.64, p. 507, as follows, ' "A pre-emption differs materially from an option. An option creates in the optionee a power to compel the owner of property to sell it at a stipulated price whether or not he be willing to part with ownership. A pre-emption does not give to the pre-emptioner the power to compel an unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption, at the stipulated price. Upon receiving such an offer, the pre-emptioner may elect whether he will buy. If he decides not to buy, then the owner of the property may sell to anyone." ' "

In *Ablett* v. *Clauson*, 43 Cal.2d 280, 284, 286, 287 [272 P.2d 753], we were concerned with a lease which gave to the lessees a " ' . . . first right and a prior option . . .' " to lease the premises " ' . . . before the same are offered to any other person, firm or corporation for lease or rental. . . .' " We held that "The clear meaning of the provision is to give the lessee a first refusal or right to lease, conditioned upon the lessor's leasing of the property again. This construction is in accordance with the Falkenstein case [81 Cal.App.2d 131, 137], and the clear weight of authority. (See anno. 6 A.L.R. 2d 820.)" In the Ablett case while we held that since only one term of a new lease, that of the time it should run, had been agreed upon by the parties, "the terms of the option are too uncertain to make it enforceable as a contract right," we also held that our holding "does not mean, however, that the rights claimed by the Abletts [lessees] may not be enforced under a different theory." From this court's quotation from, and approval of, the Falkenstein case, it is clear that it was

not intended to hold that a right of first opportunity to lease was not valid in this state. There is no sound reason for distinguishing between a right of first opportunity to purchase and a right of first opportunity to lease in that one is no more indefinite than the other. (See *Richfield Oil Corp.* v. *Security-First Nat. Bank*, 159 Cal.App.2d 184, 186, 189 [323 P.2d 834], where "an option and privilege" to purchase leased premises was involved; and *Moreno* v. *Blinn*, 81 Cal.App.2d 852, 853, 856 [185 P.2d 332], where the lease contained a clause giving the lessee a "first right to purchase.")

The record (Exhibit D) shows that on February 20, 1953, plaintiffs entered into a written lease agreement with Virgil and Ruth Smith whereby the land covered by the development and sharecrop leases was leased to said Smiths. On the same day the same parties entered into an agreement (Exhibit H) wherein it was stated that there was a "question" whether plaintiffs were "obligated to grant a right of first refusal for a new lease to one C. H. Reisner" of the land covered by the development lease and wherein the Smiths, as lessees, granted to the plaintiffs, as lessors, the right to cancel the lease as to that land if plaintiffs were found to be so obligated.

The record contains a letter (Exhibit R) from C. H. Reisner to W. K. Dunne, dated March 6, 1952, which contains the following statement: "We are sure sorry we missed you when you were down last. When we talked to you the time before *it was your wish that we take a five or ten year cash lease on the entire place, which we would like to do—at least 5 years with an option for another five year period.*"

On March 11, 1953, defendant's attorney wrote to plaintiffs' attorney a letter which included the following statement: "As you know, under the Agricultural Development Lease dated June 17, 1947, between Miss Nelson and Mr. Dunn and Henry Schnaidt, of which our client is the assignee, it is provided in Paragraph 13 thereof that Lessors shall give to Lessee the right of first refusal of a new lease at the expiration of the term of this lease. As I understand it, the term of lease has not expired and we assume that before making any new leasing arrangements with parties other than our client, the Lessors shall give Mr. Reisner, the present Lessee, the right of first refusal for a new lease. If such right of first refusal is not granted as provided for in said lease, we believe that the Lessors shall have breached their contract."

On March 23, 1953, plaintiffs' attorney wrote to defend-

ant's attorney, that "Mr. Dunne informs me that he has not executed a new lease of the premises. He has contemplated so doing and so that there will be no possible doubt upon the subject I am herein now giving your client the right of first refusal upon a lease of the premises upon the following terms and conditions:

"The lease shall be for the term of ten years at the rate of $100.00 per acre per year. The rent shall be payable in periods of six months in advance and the rent for the last year shall be paid in advance with the provision that if the lessee complies with the terms of the lease it shall be applied to the rental for the last year. The lease shall provide that there shall be no double cropping and that the property will be farmed in a farmerlike manner and that the land shall be rotated by planting one-third in alfalfa, one-third in cotton and one-third in pota*tos*, with proper fertilization. The lease shall cover the entire 333 acres and shall contain such further provisions as shall meet the approval of yourself and me and as are customary in leases of this character. In addition to the foregoing Mr. Dunne shall be reimbursed for the actual moneys expended by him in preparing the ground, planting and fertilizing up to date, for which he will produce bills, this work not having been done by your client."

The original development lease between plaintiffs and Schnaidt provided for an annual rental of $7.00 per acre; the Smith lease provided among other things that the term of the lease was for three years for such of the land as should be planted to alfalfa, and for two years for land planted to potatoes. It also provided that for the first year of the lease all the alfalfa grown and harvested should belong to the lessees; that for the next two years, the lessors were to receive as rent one-third of the alfalfa grown and harvested. The Smith lease also provided that the lessors were to receive as rent one-fourth of all cotton and cotton by-products, and one-sixth of all potatoes grown upon the land.

The trial court found that plaintiffs entered into the Smith lease on February 20, 1953, without the knowledge or consent of the defendant; that plaintiffs did not inform defendant of the terms of the Smith lease; that "On or about March 23, 1953, plaintiffs informed defendant in writing that they had not executed a new lease of the premises, and that they contemplated doing so, and that pursuant to said development lease they were thereby giving defendant his right of first refusal pursuant to said right of first refusal clause for a new

lease of the premises, upon condition . . . [heretofore set forth]. . . . Said purported offer to defendant for said proposed new lease was not made by plaintiffs in good faith. The said purported offer was exorbitant and unreasonable and was made by plaintiffs for the purpose of defeating the rights of the defendant under said right of first refusal clause and for the purpose of causing defendant to remove himself from the leased premises and for the purpose of denying defendant his rights under said first refusal clause.''

The court further found that defendant was at all times ready, willing and able to enter into a lease with plaintiffs on the same terms and conditions as those contained in the Smith lease; that the plaintiffs had not offered to defendant the right to enter into a new lease on the property nor had they extended to defendant the right of first refusal of a new lease on the property subject to the development lease; that as a result of the failure of the plaintiffs to comply with the terms of the development lease, defendant was directly and proximately injured in the sum of $30,643.[3]

It is quite obvious from the evidence heretofore set forth that the court's findings are amply supported by the record.
■ Plaintiffs contend that defendant waived his right to first refusal in failing to accept their offer for a new lease. As we have just set forth the trial court found plaintiffs' purported offer of a new lease to be exorbitant, unreasonable, and that it was not made in good faith. In *Barling* v. *Horn* (Mo.), 296 S.W.2d 94, 98, 99, the court said: ''We believe it could not be rightly urged that the written offer of September 9th to sell the property to plaintiffs for $30,000, which offer was not accepted by plaintiffs, discharged lessors-defendants Horn from their agreement to afford lessees-plaintiffs the first opportunity to purchase. *R. F. Robinson Co.* v. *Drew, supra* [83 N.H. 459 (144 A. 67)], correctly treated with such a contention, we think. In that case the lease contained a clause that, in case of a sale by the lessor, ' ''the lessee shall have the preference as a purchaser.'' ' The lessor decided to sell and offered the property to plaintiff-lessee at a price plaintiff declined to pay. Later the lessor sold it at a lower price without first giving plaintiff an opportunity to buy at the lower price. Said the reviewing Supreme Court of New Hampshire, 'The lessor's offer at a price the lessee declined to pay did not discharge him from obligation to offer when he

---

[3]As heretofore noted this sum was reduced by $2,626.27.

decided to sell at a lower price. The lessee's "preference as a purchaser" continued during the term unless the property was sold at a price the lessee would not pay. Decision to sell at the reduced price was within the tenor and scope of the option, and the lessee's right to buy thereat was given as much as the right to buy at the higher price. The option did not mean that its obligation should be discharged upon the rejection of a single offer. A contrary view, if it would not be promotive of bad faith, would largely destroy the evident purpose the option sought to accomplish.'" In *Tamura* v. *De Iuliis*, 203 Ore. 619 [281 P.2d 469, 472], where the court was concerned with the same problem, it was held: "The evidence strongly supports the proposition that the price fixed by the lessor was so exorbitant as to be an evidence of bad faith. Furthermore, the fact that the lessee was to have the first option to buy indicates to our mind that the parties contemplated the usual situation whereby if the owner receives an offer from a third party, the lessee, or the person having the first option to buy, shall have a right to meet any such bona fide offer of the third party. Such is the meaning of the 'first option to buy' referred to in the clause of the lease.''

■ Plaintiffs argue that defendant's option had terminated since he had not faithfully performed the covenants contained in the lease. This argument is without merit. The trial court found that defendant had performed the terms of the lease and, as we have previously set forth, there is substantial evidence to support such findings. Plaintiffs also urge that defendant surrendered the premises. The court found to the contrary and from what has been heretofore set forth it is quite obvious that defendant at all times insisted on plaintiffs' compliance with the right of first refusal clause contained in the development lease.

Plaintiffs' final argument is that the award of damages to defendant is based "upon conjecture and pure speculation" and that there is no evidence in support thereof. The record shows that the trial court allowed damages only to the date of trial—which began on October 27, 1955, and consumed three trial days. Plaintiffs' argument appears to be that because defendant did not keep his books for the land leased under the development lease on a cost accounting basis there is no way to ascertain the damages suffered because of the loss of that land. It will be recalled that defendant paid plaintiffs a sum certain per acre a year for the land under the development lease so that there was no reason for defendant

to keep a separate cost accounting system for that particular land. The record shows that defendant farmed 1,180 acres alone in 1951 as well as 10 acres on a fifty-fifty partnership with others; and that in 1952 he farmed 1,136 acres. Evidence was introduced showing the profit made by him per acre on comparable land in the same area where the same crops were grown. Various witnesses testified to the profits made by them per acre for the same crops during the years under consideration. Plaintiffs' lease to the Smiths was also in evidence.

■ Plaintiffs contend that the damages awarded were based on "general averages" and that such an award is erroneous. In *Shoemaker* v. *Acker*, 116 Cal. 239, 246 [48 P. 62], it was held: "As appellant by his own wrong forced respondent into the strait of proving damages, he cannot complain that the latter used the best methods left him for accomplishing the result." (And see *Hoag* v. *Jenan*, 86 Cal.App.2d 556, 562 [195 P.2d 451].) ■ In *Unruh* v. *Smith*, 123 Cal.App.2d 431, 435, 436 [267 P.2d 52], evidence was admitted of average costs of producing and profits made on cucumbers in the area concerned. The court held that "Defendants could not by refusing to accept the cucumbers claim the benefit of such prevention and thereby prevent plaintiffs from obtaining damages for breach of the contract. A party to a contract cannot take advantage of his own act or omission to escape liability thereon. Where a party to a contract prevents the fulfillment of a condition or its performance by the adverse party, he cannot rely on such condition to defeat his liability. (*Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 371 [210 P.2d 757].)" (And see *James* v. *Herbert*, 149 Cal.App.2d 741, 749 [309 P.2d 91]; *Buxbom* v. *Smith*, 23 Cal.2d 535, 541 [145 P.2d 305].) ■ In *James* v. *Herbert*, 149 Cal.App.2d 741, 749 [309 P.2d 91], it was held that "Where the prospective profits are the natural and direct consequences of the breach of the contract they may be recovered. Profits are part and parcel of the contract itself, entering into and constituting a portion of its very element; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed, perhaps, the only inducement to the arrangement. (*Hoag* v. *Jenan*, 86 Cal.App. 2d 556, 562-563 [195 P.2d 451].) ■ Damages consisting of the loss of anticipated profits need not be established with certainty. It is sufficient that it be shown as a reasonable

172

probability that the profits would have been earned except for the breach of the contract. (*Stott* v. *Johnston*, 36 Cal.2d 864, 875 [229 P.2d 348, 28 A.L.R.2d 580]; *Hacker etc. Co.* v. *Chapman V. Mfg. Co.*, 17 Cal.App.2d 265, 267 [61 P.2d 944].)''

We conclude that there is ample support in the record for the trial court's determination of the damages suffered by defendant.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.