[Civ. No. 38647. Second Dist., Div. Five. Aug. 21, 1974.]

PAUL L. McGIRR, Plaintiff and Appellant, v.
GULF OIL CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Robert W. Driscoll for Plaintiff and Appellant.

Roberts, Carmack & Johnson, Richard W. Curtis and Jonathan E. Johnson for Defendants and Respondents.

**OPINION**

**KAUS, P. J.**—Plaintiff Paul McGirr sued defendant Gulf Oil and Ted Marks, a Gulf employee, alleging breach of an oral contract to lease a service station for five years. The jury returned a $30,000 verdict in favor of plaintiff. The trial court denied defendants' motion for new trial, but granted their motion for judgment notwithstanding the verdict.[1] Plaintiff appeals; both defendants have filed a joint "protective" cross-appeal from the judgment entered on the verdict.

FACTS

Plaintiff has operated many gasoline service stations since 1958. In November 1965 he began operating an Enco station, averaging gasoline sales of about 25,000 to 35,000 gallons a month.

Plaintiff telephoned Gulf in February 1966 about an ad for dealers. Defendant Marks, an area representative of Gulf, called on plaintiff at his

---

[1]The trial court filed a detailed memorandum opinion stating why, in its view, plaintiff's proof was "legally insufficient to permit the jury's verdict to stand." It found that there was no evidence to support findings that Marks was "the actual or ostensible agent" of Gulf, that Gulf ratified Marks' acts, or that Gulf was estopped to rely on section 1624, subdivision 4 or section 2309 of the Civil Code. Although, arguably, the role of the jury on the estoppel issues was advisory only (*Jaffe* v. *Albertson Co.*, 243 Cal.App.2d 592, 607-608 [53 Cal.Rptr. 25]; cf. *Raedeke* v. *Gibraltar Sav. & Loan Assn.*, 10 Cal.3d 665, 674, fn. 4 [111 Cal.Rptr. 693, 517 P.2d 1157]), the record contains no hint that either side or the court regarded it as such. We therefore examine the correctness of the judgment notwithstanding the verdict by the usual criteria. (*Dailey* v. *Los Angeles Unified Sch. Dist.*, 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360]; *Estate of Flood*, 217 Cal. 763, 768 [21 P.2d 579].)

Enco station. Marks' responsibilities as a sales representative were mainly to act as a "go-between between the dealer and the company." Plaintiff asked Marks if Gulf had any good, high producing units available. Marks said he would check into it.

About two days later Marks came by plaintiff's Enco station. Plaintiff's employee, one Renard, was present at the meeting. Marks said that he had a station available that averaged sales of about 200,000 gallons of gasoline a month. Plaintiff saw a company ledger sheet showing 178,000 gallons pumped during a slow month. Plaintiff said he would take the station. Marks said that the lease would be for five years, the station was to be open 24 hours a day, and plaintiff would pay the taxes on the tires, batteries, and accessories. Marks then said that there was a problem: the company was going to "dump" the dealer presently there, and the unit would not be available for 90 days. After they discussed the terms of the lease, plaintiff asked Marks to write them down on a piece of paper; Marks replied he did not have to, that he was the "kingpin in [his] territory"; so they shook hands. This station was the Gulf station at Figueroa and Avenue 26.

Marks then said there was just one more catch: he had a "dog" station on Garvey Avenue and would have to lease it before he could lease the good one. Plaintiff said, "in other words, if I take this one down here [the Garvey station] I am guaranteed this one downtown [the Figueroa station]?" Marks answered, "Yes." They then discussed when plaintiff could start. Marks told plaintiff he could look at the Figueroa station but should not talk to the dealer because Gulf did not want him to know he was losing his lease.

At another meeting, plaintiff and Marks went together to the Garvey station and to the Department of Water and Power. Plaintiff then gave Enco notice of termination. He moved some of his property from the Enco station to the Garvey station, bought stock and inventory from Gulf for $3,000 and paid it a gasoline deposit of $750. During several contacts with Marks, plaintiff reiterated what a great opportunity it was to get his hands on a unit of the size of the Figueroa station. Several weeks after plaintiff had been in possession of the Garvey station, he signed a standard pre-printed one-year lease for that station. It was dated March 8, 1966, the day he had moved in.

Marks' version of the events varied in significant details: Although the Figueroa station was discussed, he told plaintiff that it was not available; he never entered into any oral agreement to lease it; in fact he had no

authority to enter into leases for Gulf. The written lease for the Garvey station was signed by plaintiff on March 8, 1966, before plaintiff took over the Garvey station. The lease was then signed for Gulf by Max Reed, the regional sales manager. Marks later took back copies of the lease and other documents to plaintiff.

According to plaintiff, after taking over the Garvey station, he spoke to Marks several times about the Figueroa station and Marks assured him that the Figueroa station would be available within the 90-day period promised.

No written lease or other writing of any kind was ever presented or signed by Marks or by any other representative of Gulf with respect to the Figueroa station.

In any event, after plaintiff began operating the Garvey station, its sales declined. Plaintiff testified that he did not try very hard once he learned about Gulf's position that there was no agreement about the Figueroa station. This happened within a few months, after Marks had been transferred to a different territory.

Plaintiff's testimony was partly corroborated by Renard, plaintiff's employee, who testified that he was present at the conversation between Marks and plaintiff at which the oral lease for the Figueroa station was made. The plan was that Renard would operate the Garvey station and plaintiff would operate the Figueroa station. Marks, however, testified that Renard was never present at any meeting between himself and plaintiff, and that he did not meet Renard until a deposition was taken in connection with this litigation.

Reed, who signed the Garvey lease for Gulf, testified that the functions of a sales representative did not include leasing a station.

### PLAINTIFF'S APPEAL FROM JUDGMENT
### NOTWITHSTANDING THE VERDICT

Plaintiff maintains that there was substantial evidence to support the verdict on the key issues: (1) Marks' agency to enter into a lease on behalf of Gulf; and (2) Gulf's estoppel to claim the benefit of the applicable provisions of the statute of frauds, that is to say, section 1624, subdivision 4, and section 2309 of the Civil Code.

Since we have reached the conclusion that plaintiff is barred from any recovery by the provision of section 2309 of the Civil Code—the so-called

"equal dignities rule"—to the effect that an agent's "authority to enter into a contract required by law to be in writing can only be given by an instrument in writing," we deal with the other issues somewhat summarily.

■ There was no evidence that Marks had actual authority to lease stations as Gulf's agent. Plaintiff does not really contend otherwise. He does claim, however, that Marks had ostensible authority to make binding leases on behalf of Gulf. Section 2309 aside, we think that plaintiff is correct. Thus we have little doubt that if Marks had purported to make an oral one-year lease for the Garvey station, Gulf would have been bound by his agreement. Without going into detail, it appears that Gulf conferred on Marks express authority to do everything in connection with leasing stations except the actual "closing" of the deal. Whether or not, absent further facts, that would be sufficient, need not be decided. Of paramount importance under the facts of this case is that according to plaintiff Gulf permitted him to operate the Garvey station for several weeks before the landlord-tenant relationship was ever formalized by a writing. This actual occupancy of the station apparently required the cooperative efforts of several Gulf employees other than Marks himself. We think there is substantial evidence in the record that Marks had ostensible authority to do more than just negotiate with prospective station operators.

■ With respect to the requirements of the statute of frauds, plaintiff claims that the statute was waived by defendants' failure to assert it until plaintiff had given substantial testimony. Plaintiff is mistaken. After plaintiff had testified for a while, defendants made a motion to strike all of his testimony relating to the oral lease of the Figueroa station. At that point defendants relied on Civil Code section 1624, subdivision 4. The court deferred its ruling. Later defendants made a motion "to dismiss" plaintiff's case on grounds of the statute of frauds and the equal dignities rule.

An objection or motion to strike on grounds that evidence violates the statute of frauds may be made at any time during the trial. (*Carrier & Braddock* v. *S. W. Straus & Co.*, 213 Cal. 508, 513 [2 P.2d 811];[2] see *Pao Ch'en Lee* v. *Gregoriou,* 50 Cal.2d 502, 506 [326 P.2d 135].)

■ As far as Civil Code section 1624, subdivision 4, is concerned, we agree with plaintiff that defendants are estopped from relying on it. "The

---

[2]*Carrier* overruled *sub silentio Livermore* v. *Stine,* 43 Cal. 274, 278, holding that where evidence "on its face" violates the statute of frauds, an objection "should have been made when it was offered," or the objection is waived. (See also *Schultz* v. *Noble,* 77 Cal. 79, 80-81 [19 P. 182].)

doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract [citations], or in the unjust enrichment that would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute. [Citations.] In many cases both elements are present." (*Monarco* v. *Lo Greco,* 35 Cal.2d 621, 623-624 [220 P.2d 737].)

The question is what constitutes unconscionable injury or a serious change of position. *Monarco* is indeed a classic case of unconscionable injury in which the injured person, when he was 18 years old, remained with his parents and gave up any opportunity to be educated or to acquire property in reliance on his parents' representation that the family property would be willed to him. As it turned out, 20 years later the property was willed to somebody else. (35 Cal.2d 622-623, 627.)

However, the doctrine applies even where a lesser quantum of injury or reliance is demonstrated. In *Wilk* v. *Vencill,* 30 Cal.2d 104 [180 P.2d 351], the defendants reneged on an oral agreement to sell real property. The plaintiffs had given up a chance to buy another comparable house and spent some time working on the property before defendants refused to go through with the contract. (30 Cal.2d at pp. 106-107.) The court held that these facts, if proven, were enough to estop defendants from relying on the statute of frauds. (*Id.,* at p. 108.)

In this case, plaintiff ended his Enco lease, entered into the Gulf lease for the Garvey station, paid a $750 gasoline deposit to Gulf and bought stock and inventory from Gulf for some $3,000.[3] He went from a station at which he was making money to a losing proposition. The quantum of injury and reliance is comparable to that in *Wilk.* (Cf. *Lewis* v. *McWhirter Petroleum Co.,* 89 Cal.App.2d 453, 456 [200 P.2d 856].)

We disagree with defendants' contention that this case should be controlled by *Ruinello* v. *Murray,* 36 Cal.2d 687 [227 P.2d 251], where the plaintiff alleged that he had given up a lifetime position to take a job with the defendant who fired him after several years. (36 Cal.2d at p. 688.) The

---

[3]Under the form lease dated March 8, 1966, plaintiff, as lessee, could terminate the one-year lease on 90 days' notice to Gulf, which could terminate on 30 days' notice. If the lease were terminated for any reason by either party, defendant lessor was under no obligation to repurchase any inventory held by the lessee for resale.

court construed a contract for lifetime employment as being terminable at the will of either party (*id.,* at p. 689), and held that quitting such a job does not result in unconscionable injury (*id.,* at p. 690).

Defendants are correct in asserting that plaintiff's ending his lease with Enco was comparable to the plaintiff in *Ruinello* quitting his job, because the Enco lease was terminable by either party on 24 hours' oral notice. However, the reliance in this case consists of more than the exchange of the Enco station for the Gulf station: there is the relatively substantial investment required of plaintiff and his taking over of an unprofitable station for a minimum period of 90 days. (See fn. 3, *supra.*) In these circumstances *Ruinello* does not apply.

■ This brings us to the decisive issue: whether the trial court correctly ruled that there was no evidence to support a finding that Gulf was estopped to rely on the admitted fact that whatever authority Marks had was certainly not in writing.

California's so-called "equal dignities rule" is embodied in section 2309 of the Civil Code and reads as follows: "An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing."[4]

■ As we shall see, the authorities recognize that under certain circumstances a principal may estop himself from claiming the benefit of section 2309, but such estoppel must be based on the principal's own acts or representations. The mere fact that his agent has conducted himself in such a way that his oral contract will be enforced, although it is of such a nature that ordinarily it must be in writing, cannot automatically get the third person over the next hurdle: that even if he and the agent had contracted

---

[4]Historically and conceptually the equal dignities rule derives from the "Act for prevention of frauds and perjuries" enacted by Parliament in 1676 (29 Car. II, ch. 3), the original statute of frauds. Section 1 of that statute transformed leases exceeding three years and certain other estates into leases or estates at will, unless "put in writing, and signed by the parties so making or creating the same, *or their agents thereunto lawfully authorized by writing* . . ." (Italics added.)

The act also commanded that after June 24, 1677, leases of freehold estates were not to be assigned, granted or surrendered "unless it be by deed or note in writing, signed by the party so assigning, granting or surrendering the same, *or their agents thereunto lawfully authorized by writing,* or by act and operation of law." (Italics added.)

Although the common genesis of sections 1624 and 2309 of the Civil Code has been judicially recognized (*Sunset-Sternau Food Co.* v. *Bonzi,* 60 Cal.2d 834, 838 [36 Cal.Rptr. 741, 389 P.2d 133]), for purposes of easy distinction we refer to the latter section as the "equal dignities rule" and use the term "statute of frauds" narrowly to apply only to section 1624.

in writing, he still could not hold the principal in the absence of proof of written authority. Otherwise, an oral lease for five years—or any other contract within the statute of frauds—entered into between the third person and the agent would have greater legal effect than a written lease! This principle was accepted by the California Supreme Court as a matter of course in *Seymour* v. *Oelrichs*, 156 Cal. 782 [106 P. 88]. That case is, of course, best remembered as one of our leading cases on estoppel to rely on the statute of frauds. Relatively unnoticed, however, is the fact that the oral contract in question was made by the husband of one of the heirs to an estate as agent for his wife and her sister, another heir. This, naturally, raised the additional issue whether the husband had written authority from the two heirs as required by section 2309 of the Civil Code.

Procedurally the case involved an appeal by the defendants from a judgment for the plaintiff, the trial court having found that certain writings satisfied the statute of frauds. The Supreme Court reversed, holding that " 'nothing in any of the writings . . . shows any such contract as the one set up by plaintiff.' " (*Id.* at p. 787.) It then, in an elaborate opinion, discussed what the plaintiff would have to show on retrial in order to estop defendants from relying on Civil Code section 1624, subdivision 1.

If it were the law that estoppel to claim the benefit of the statute of frauds automatically solved the plaintiff's problems with regard to the equal dignities rule, it would have been quite unnecessary for the court to mention that rule. Quite to the contrary, however, the court clearly holds that whatever evidence of estoppel the plaintiff might adduce to take the case out of the operation of Civil Code section 1624, subdivision 1, he would not be relieved from proving written authority to satisfy section 2309: "(It is contended by the respondent that . . . he is entitled to recover upon the theory of an estoppel. The alleged estoppel is based upon the findings of the court to the effect that [respondent], upon the faith of representations that he would have a ten-year contract, resigned and lost irrevocably his position in the police department. This cannot, in the present state of the record, be invoked as a ground for affirming the order. If [the husband] had no authority to bind [the two heirs] by a ten-years' contract, they could not be estopped by his declaration that they would give [respondent] such contract, unless they took some action with notice of the fact that this declaration had been made. [Citation.] . . . *If it could be said that the evidence justifies an inference that [the husband] had authority to bind one or both of the appellants by some sort of contract, it does not, in the absence of proof of written authority (Civ. Code, sec. 2309), justify*

*the inference that he had authority to bind them by a contract required to be in writing.'"* (*Id.* at pp. 790-791. Italics added.)

A little later in its opinion the court prefaced its discussion of the doctrine of estoppel to rely on the requirement of a written 10-year contract by saying: "In our discussion we shall assume, of course, that [the husband] was duly authorized in writing to enter into such a contract on behalf of the defendants as is alleged to have been made by him with plaintiff." (*Id.* at p. 792.)

That the law of estoppel to rely on the various subdivisions of section 1624 of the Civil Code has been considerably liberalized—or, perhaps, clarified—since *Seymour* v. *Oelrichs* is immaterial. The plain fact is that there the Supreme Court held that where a contract which comes within the statute of frauds is made with an agent of the principal sought to be held, an estoppel to rely on the statute of frauds does not, automatically, dispense with the requirement that the agent's authority must be in writing.

Of course, even absent such written authority, the principal may be estopped from claiming the benefit of the equal dignities rule. We shall therefore examine the authorities which have recognized such an estoppel.[5]

While, in some cases, it is not easy to isolate and identify the exact basis for the decision,[6] true cases of estoppel—as distinguished from those referred to in footnote 5, *supra*—fall into two categories.

---

[5]We lay aside situations to which section 2309 simply do not apply, such as cases where the agent's authority is ministerial, rather than discretionary (*Ellis* v. *Mihelis,* 60 Cal.2d 206, 214 [32 Cal.Rptr. 415, 384 P.2d 7]), where the agent signs the contract in the presence and at the direction of the principal (*Videau* v. *Griffin,* 21 Cal. 389, 392), where the agent is an executive officer of the principal-corporation (*Jeppi* v. *Brockman Holding Co.,* 34 Cal.2d 11, 17 [206 P.2d 847, 9 A.L.R.2d 1297]) or where the dispute is between the agent and the principal (*Sunset-Sternau Food Co.* v. *Bonzi, supra,* 60 Cal.2d 834, 842). Similarly, we can ignore cases where the agent's initial lack of written authority was cured by a written ratification. (Civ. Code, § 2310.) Finally, we are not confronted with a situation where the agent, who lacked written authority was acting for an undisclosed principal who permitted the agent to hold himself out "as the principal with full power to contract." (*Marr* v. *Postal Union Life Ins. Co.,* 40 Cal.App.2d 673, 679 [105 P.2d 649].)

[6]Thus, Professor Nielson, who prepared the 1937 annotations to the Restatement of Agency, says in the California annotations to section 31 of the Restatement Second—"Estoppel to Deny Authorization": "This principle has been recognized repeatedly. Often, however, where the principal is held, the result is reached by a cumulation of additional elements such as personal participation in the transaction by the principal, the receipt of benefits by him, the doctrine of part performance and the doctrine of ratification. This makes it difficult to determine the exact basis upon which the result is reached. In the cases here cited the principle of the subsection is recognized and discussed, though in some of them, on the facts, the court concludes that no estoppel is raised."

First, there are the cases where the principal has done something which has caused the third person to believe that written authority exists or is unnecessary.[7]

Thus, a principal may not rely on lack of written authority if he has falsely told the third person that the agent has a "power of attorney" (*Reusche* v. *California Pac. Title Ins. Co.,* 231 Cal.App.2d 731, 735 [42 Cal.Rptr. 262]); he cannot furnish the agent with signed bonds or forms containing blanks, permitting him to fill in the blanks before delivering the papers to third parties and later rely on the agent's lack of written authority to do so (*Dolbeer* v. *Livingston,* 100 Cal. 617, 621 [35 P. 328]; *People* v. *National Auto. & Cas. Ins. Co.,* 244 Cal.App.2d 491, 494-495 [53 Cal.Rptr. 297]); he may not give the agent a signed deed pertaining to a transaction and later repudiate impliedly authorized escrow instructions (*Karl* v. *JeBien,* 231 Cal.App.2d 769, 773 [42 Cal.Rptr. 461]); and finally, he may not rely on the agent's lack of written authority to convey property where he has clothed him with indicia of ownership (*Vezaldenos* v. *Keller,* 254 Cal.App.2d 816, 827 [62 Cal.Rptr. 808].)

The second class of cases in which principals have been estopped to rely on section 2309 of the Civil Code is typified by *Higson* v. *Montgomery Ward & Co.,* 263 Cal.App.2d 333 [69 Cal.Rptr. 497]. In that action for a real estate broker's commission, the defendant-corporation orally authorized one Parker to handle various transactions necessary in the purchase of certain parcels of property, leaving the details to him. In connection with the acquisition of one parcel, Parker, in writing, authorized the payment of a commission to the plaintiff Higson. Resisting payment thereof, the defendant relied on section 2309. This defense was found to be unavailing because "with complete knowledge of the circumstances" the defendant had received the benefits resulting from its oral authorization to Parker. (*Id.* at p. 342; see also, *Corporation of America* v. *Harris,* 5 Cal. App.2d 452, 460-461 [43 P.2d 307].)

---

[7]These cases are basically in accord with section 31 of the Restatement Second of Agency, which reads as follows: "(1) A person who manifests to a third person that he has authorized an agent by an instrument under seal or by other formality is subject to liability to such third person as if the authorization had been by such means, if the third person changes his position in reasonable reliance upon the manifestation.

"(2) If a principal entrusts to an agent an executed document containing blanks, and the agent fills the blanks without authority and delivers the document to a third person, who changes his position in reliance thereon without notice that the principal did not fill the blanks before execution of the instrument, the principal is subject to liability to the third person as if the instrument had been completed by the principal or by an agent properly authorized to fill the blanks."

The common denominator of these two recognized instances of estoppel is that each is based on some conduct of the principal himself. It must be he who lulls the third person into believing that the agent has written authority or does not need it; it must be he who retains the benefits of the contract with knowledge of the circumstances.

 Manifestly, nothing of the kind is present in this case. The most that can be said of Gulf is that it permitted Marks to appear to be an agent who could enter into lease agreements with prospective operators. In no way did Gulf create an impression that Marks had authority to enter into leases for more than one year or that whatever authority he had was in writing. Nor is there any evidence that Gulf accepted any benefits which may have resulted to it from plaintiff's brief occupancy of the Garvey station with knowledge that plaintiff intended them as part and parcel of a contract that included a five-year lease to the Figueroa station.[8]

To sum up: If plaintiff had dealt with an agent whose authority was in writing or with an executive officer of Gulf to whom the equal dignities rule did not apply (see fn. 5, *supra*), Gulf would be estopped from relying on section 1624, subdivision 4, of the Civil Code because plaintiff's expenditures with respect to the Garvey station would make it "unconscionable" for Gulf to rely on the statute of frauds. Since, however, plaintiff did not deal with an agent whose authority was in writing nor with an executive officer, it would subvert the very purpose of section 2309 to estop Gulf: it had done nothing to mislead plaintiff into believing that section 2309 was satisfied or would not be relied on, nor did Gulf knowingly accept any benefit of the oral five-year lease relied on by plaintiff.

The judgment is affirmed. The defendants' appeal is moot and dismissed.[9]

Stephens, J., and Hastings, J., concurred.

A petition for a rehearing was denied September 12, 1974, and appellant's petition for a hearing by the Supreme Court was denied October 24, 1974. Tobriner, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.

---

[8]It should be noted that in certain respects the facts of this case nicely parallel those of *Seymour* v. *Oelrichs, supra,* 156 Cal. 782. There it was undisputed that the heirs knew that the husband had hired the plaintiff. However, what the plaintiff tried to prove was not just a simple hiring, but a 10-year employment contract. So here it is undisputed that Gulf knew that plaintiff had a lease to the Garvey station and there is some evidence that it recognized the validity of that lease before Reed, the man with actual authority, signed it. However, the contract which plaintiff sought to prove was not just the short-term lease of the Garvey station but a package which included the disputed five-year lease to the Figueroa station.

[9]Throughout this litigation, apparently for tactical reasons, plaintiff proceeded against Gulf and Marks as if they were a single defendant: thus, it was never contended that if Gulf was not liable, Marks would be in breach of his warranty of authority. (Civ. Code, § 2342 et seq.) Affirmance of the judgment in favor of Marks therefore follows automatically from the affirmance as to Gulf.