[Civ. No. 45449. Second Dist., Div. Two. Apr. 1, 1976.]

LEWIS KERNER, Plaintiff and Respondent, v.
HUGHES TOOL COMPANY, Defendant and Appellant.

## Counsel

Davis & Cox, D. Martin Cook, Hill, Farrer & Burrill, William M. Bitting and David C. Grant for Defendant and Appellant.

Arthur J. Crowley and Howard E. Blumenthal for Plaintiff and Respondent.

## Opinion

**FLEMING, Acting P. J.**—Defendant Hughes Tool Company (now Summa Corporation) doing business as Frontier Hotel appeals the judgment in favor of plaintiff Lewis Kerner in an action for breach of contract. The trial court found that defendant repudiated an agreement for plaintiff to produce "My Fair Lady" in the main showroom of the Frontier Hotel in Las Vegas for 26 weeks at $75,000 per week. The court assessed damages from loss of profits of $10,000 a week at $260,000.

### Facts

The evidence, viewed in a light most favorable to the judgment (*Crawford v. Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]), shows:

Plaintiff Lewis Kerner had spent his life in show business, first as entertainer, then as producer, agent, and talent director. He helped bring the first motion pictures to television, produced religious short subjects for television, and later produced the motion picture, "Never on Sunday."

Frank Sennes had been a hotel entertainment director in Las Vegas since 1950. He handled the booking of entertainment and had the responsibility for presentation of million-dollar spectaculars, some of which ran for more than a year. In 1968 Sennes was entertainment director of the Frontier, Desert Inn, and Stardust Hotels. He had always worked as an independent contractor under oral agreement. When defendant purchased the Frontier Hotel in 1967 Sennes asked for a written contract but consented to continue to serve on oral agreement when defendant's representatives said everything would be all right.

Defendant always honored contracts made on Sennes' signature. The title on the door of his office read "Entertainment Director," and the marquee of the Frontier Hotel bore the legend "Frank Sennes Presents."

In 1968 plaintiff put together a variety show called "Let's Make Love" and auditioned it for Sennes. Sennes signed a contract on behalf of the hotel to pay $10,000 a week for the show. It opened in February 1969 in the hotel lounge and played for several weeks.

While plaintiff was preparing the variety show for production he proposed to Sennes a production of the musical "My Fair Lady" for the main showroom of the Frontier Hotel. Sennes spoke about the musical to Mr. Schwind, the managing director of the hotel, and Schwind said if Sennes liked it he would go along.

On 26 June 1968 Sennes told plaintiff that if he could deliver "My Fair Lady" for $75,000 per week including orchestra he had a deal. Plaintiff said at that price he would need a year to amortize costs. Sennes agreed. Plaintiff said it would be a class A production with top stars. Sennes said he would leave the casting to plaintiff and that he would get the money from the hotel for preproduction costs.

On 27 June 1968 Sennes gave plaintiff the following letter on Frontier Hotel stationery:

Dear Lew:

This is to advise you that I am ready, willing and able, and will play "My Fair Lady" around February or March of 1969 at the Frontier Hotel for a minimum guaranteed run of one year at Seventy-five Thousand ($75,000.00) Dollars weekly for show and orchestra.

It is further agreed and understood that if you are unable to bring "My Fair Lady" in for a price of $75,000.00 that you will notify me immediately and in no event later than August 27, 1968.

This agreement will serve as a firm commitment.

Sincerely,
/s/ FRANK SENNES

FRANK SENNES
Director of Entertainment

During the following weeks plaintiff made several trips to New York for the sole business purpose of arranging to produce "My Fair Lady." He obtained the music and book and began negotiations with CBS, Inc., the owner of the rights to the musical. CBS eventually agreed to permit plaintiff to present "My Fair Lady," shortened to 90 minutes to meet Las Vegas standards, on condition that plaintiff pay royalties of $240,000 for a one-year minimum use of the musical, obtain a bank guarantee of his performance, and allow Edwin Lester, who was presenting "My Fair Lady" in Los Angeles, cast approval and script approval. Plaintiff traveled to Dallas to view a production of "My Fair Lady" and inquire about costs, use of sets, and employment of performers. Plaintiff began to line up stars for his production, and he arranged for use of scenery and costumes that had been used in other presentations of the musical. He subsequently obtained Edwin Lester's agreement to act as artistic consultant.

On 4 August 1968 plaintiff wrote Sennes:

"It was good talking to you yesterday.

"This letter will confirm our telephone conversation.

"I am very happy and pleased to report that CBS has now given me permission to reduce the playing time of 'My Fair Lady' to a one-hour-and-a-half presentation.

"With reference to your letter of June 27th, the agreed upon price of $75,000.00 per week for show and orchestra is okay."

About mid-August 1968 plaintiff gave Sennes a copy of the formal licensing agreement CBS wanted him to sign. In September 1968 Sennes told plaintiff he was being criticized for making a one-year deal and having trouble placing already-booked attractions at other hotels. He asked plaintiff to reduce the commitment for the production to six months. On 16 September 1968 Sennes wrote plaintiff:

"We have been advised that 'My Fair Lady' will not be available at the time referred to in our referenced letter. We further understand that its unavailability is due to Mr. Edwin Lester having priority in showing the same in Los Angeles and San Francisco, therefore, it is not available until after September, 1969.

"Due to the change in availability, we must reduce our guarantee to six months with three month options.

"May we hear from you in the near future regarding an open date convenient to all parties."

CBS subsequently consented to the six-month reduction and sent plaintiff a revised license agreement which specified an opening date of January 1970 and a minimum six-month performance.

Attorneys for defendant prepared a contract for the production of "My Fair Lady." When Sennes showed it to plaintiff, the latter became upset because the contract did not reflect their understanding. Sennes continued to assure plaintiff they had a firm deal. Plaintiff prepared his own written version of the contract, and Sennes agreed it accurately reflected their understanding. Plaintiff's document specified in part that the hotel would provide $150,000 preproduction costs and all required stagehands and that plaintiff and CBS would retain artistic control over the production.

In February 1969 Richard Danner became managing director of the Frontier Hotel, a position he held pursuant to oral agreement with defendant. Plaintiff was introduced to Danner as the man who was bringing "My Fair Lady" to the hotel. Plaintiff tried several times to talk with Danner about presenting the musical at the hotel, but Danner told him the matter was foreign to him and referred plaintiff to Sennes.

In May 1969 plaintiff twice met with Danner. Danner expressed concern about presenting "My Fair Lady" and said he would rather play more profitable single acts than a Broadway show. He proposed the hotel be given the right to cancel the show on two-weeks' notice. Plaintiff said cancellation was unacceptable to him and he had Sennes' written commitment to do the show. Danner replied that he did not know a written commitment existed. An article then appeared in a Las Vegas newspaper quoting Sennes as saying he had changed his mind about presenting "My Fair Lady" at the Frontier Hotel. In June 1969 plaintiff wrote to Robert Maheu, chief of defendant's Nevada operations, asking him to correct the wrong that had been done to him. Danner then wrote plaintiff a letter in which he stated in part:

"At the conclusion of that last meeting, I got the impression that you felt that we were in some way obligated to you which completely surprised me to say the least.

"Lew, the reason that I have gone to such lengths in reiterating the history of our negotiations with you, is because I want to make clear my position that we do not consider ourselves obligated to you in any way. At the same time, I recognize that you are a man with talent and ability, and I see no reason why future business undertakings might not be mutually advantageous to us. Although I am new here at the Frontier Hotel, I am satisfied after my discussions with Frank Sennes, that we have at all times dealt with you in good faith and in an open, straight forward manner, and it is in keeping with that policy that I wish to frankly tell you that I am still not convinced that 'My Fair Lady' or 'Around the World in 80 Days' would assure us the business that we have with the leading individual entertainers. Further, it was my impression from our last meeting that you too were somewhat uncertain about the chances for the successful presentation of 'My Fair Lady.' In any event, it is my belief at this time, that we will be better off staying with top name individual entertainers rather than either of the plays which you have offered to us.

"The next time you are in Las Vegas, come by to see me."

Sennes was later authorized to offer Kerner $50,000 to settle his claim, but Kerner refused the offer. Danner instituted a policy at the Frontier Hotel that no contract could be executed without his approval.

Plaintiff testified that while negotiating on "My Fair Lady" he prepared two budgets. Amortizing costs over a year, one budget ran $53,310 a week, the second, $55,000 a week. Figuring above 1968 union scale, he included the principals, music, director, artistic director, music director, choreographer, stage manager, their assistants, chorus, wardrobe mistress, royalties, scenery, drayage, welfare, and insurance.

David Merrick, producer of seventy-eight Broadway plays, at least eight of which had been presented in Las Vegas, testified that he had made deals to present plays in Las Vegas and Los Angeles on the basis of a handshake and a one-page letter. Formalized contracts were drawn after the fact. Merrick presented "Hello Dolly" at the Riviera Hotel in Las Vegas and received $65,000 a week and a one-year guarantee, with the hotel paying the stars, stagehands, and orchestra.

Edwin Lester, producer of 86 shows for the San Francisco and Los Angeles Civic Light Opera Associations over 36 years, testified he made many deals verbally with only telegraphic confirmation. Written contracts were prepared later, sometimes after the engagement. Lester presented the full production of "My Fair Lady" in Los Angeles, and weekly operating costs amounted to $35,000. He estimated that a shortened version of the musical in Las Vegas would cost $25,000 to $30,000.

David Victorson, a director of entertainment in Las Vegas hotels for eight years, testified that he had completed deals to present acts at his hotels on a handshake or a telephone call. The written contract might not be drawn until the act opened. He had dealt orally with the Frontier Hotel to make acts available between the hotels. In Victorson's opinion, it is customary for a Las Vegas hotel to pay the cost of stagehands for legitimate theatre productions.

For the defense Irving Sudrow, a production manager, testified he prepared a detailed budget for a production of "My Fair Lady" based on 1969-1970 Las Vegas costs. He opined that without allowing for profit, the production would cost a minimum of $79,831.46 a week, including $28,000 for star performers, $8,600 for stagehands, and $5,000 for wardrobe and scenery rental.

On rebuttal Jack Schlissel, general manager for David Merrick, testified that Sudrow's budget was highly inflated, including too much for preproduction costs, star performers, stagehands, and scenery. In his opinion $50,000 to $55,000 per week was a fair estimate.

## ISSUES

Defendant contends no contract was ever made; if a contract was made, it violated the statute of frauds and the equal dignities rule; if the contract was valid, defendant did not breach it; and if defendant did breach the contract, plaintiff failed to prove damages. Defendant also contends the trial court failed to make a specially requested and required finding on the equal dignities rule.

## DISCUSSION

■ A contract must evidence a meeting of the minds on the essential elements of the agreement. (*Robinson & Wilson, Inc.* v. *Stone,* 35

Cal.App.3d 396, 407 [110 Cal.Rptr. 675].) If an essential element is reserved for future agreement of the parties, no legal obligation arises until the future agreement is made. (*Louis Lesser Enterprises, Ltd.* v. *Roeder,* 209 Cal.App.2d 401, 408 [25 Cal.Rptr. 917].) Defendant contends the contract here fails for want of agreement on the essential elements of starting date, identity of performers, responsibility for stagehands, and allocation of preproduction costs.

■ The letters of 27 June 1968 and 4 August 1968 constituted a sufficient agreement to support the contract. The basic obligations were drawn: plaintiff would provide a production of "My Fair Lady" with orchestra; defendant would pay $75,000 per week for a minimum of one year. Expert testimony showed that comparable agreements were often made on a handshake and simple written memorandum. Some elements of the agreement were not specified in the written memorandum, but it does not follow that the parties had not agreed on the essential elements or that they intended to negotiate essential elements at some later time.

■ When parties conclude a transaction in which it appears they intend to make a contract, a court will not frustrate their intention if it is possible to reach a fair and just result, even though this requires filling some gaps the parties have left. (*Rivers* v. *Beadle,* 183 Cal.App.2d 691, 696 [7 Cal.Rptr. 170].) ■ The gaps of which defendant complains here are easily filled. The letter of 27 June 1968 specified an approximate date of commencement, and that date was later postponed at defendant's request. Plaintiff testified he promised a class A production and Sennes said he would leave casting to him. Expert testimony showed that the cost of stagehands in Las Vegas legitimate-theatre productions was customarily borne by the hotel. There was no doubt plaintiff would ultimately bear preproduction costs; the only open question was whether defendant would advance these costs. Plaintiff testified Sennes said he would get preproduction money from the hotel.

■ The statute of frauds (Civ. Code, § 1624) provides that a contract not to be performed within a year is invalid unless the contract, or some memorandum of the contract, is in writing and subscribed by the party to be charged or his agent. Defendant contends the contract here is invalid because the only memoranda of contract signed by defendant, the letters of 27 June 1968 and 16 September 1968, failed to specify all the elements discussed under the previous contention.

A letter, however, may be a sufficient memorandum to take a case out of the statute of frauds. (*Menveg* v. *Fishbaugh,* 123 Cal.App. 460, 465-466 [11 P.2d 438].) The use of the word "memorandum" in the statute implies something less than a complete contract. A memorandum functions only as evidence of the contract and need not contain every term. (*Crowley* v. *Modern Faucet Mfg. Co.,* 44 Cal.2d 321, 323 [282 P.2d 33]; Cal. U. Com. Code, § 2201.) Certainly the statute does not require more written terms than are required to make the contract itself. ■ The memoranda here satisfy the statute of frauds since they contain a statement of the salient terms of the bargain: plaintiff to provide the show and orchestra; defendant to pay $75,000 a week. The modification in Sennes' letter of 16 September 1968 of the date to "after September 1969" did not render the contract fatally uncertain. Because time was not the essence of this agreement, a reasonable time within which to perform would be allowed. (Civ. Code, § 1657; *Leiter* v. *Handelsman,* 125 Cal.App.2d 243, 251 [270 P.2d 563].)

■ The equal dignities rule (Civ. Code, § 2309) declares that "An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing." Defendant contends it was not bound by the contract because its agent, Sennes, who was employed under oral agreement, lacked written authority to enter the contract.

The trial court concluded that because of estoppel the equal dignities rule did not apply, and we agree with its conclusion. A principal is estopped to raise the equal dignities rule against a contracting third party if the principal, by its own conduct, lulls the third party into believing that its agent has written authority to enter the contract or has no need of written authority. (*McGirr* v. *Gulf Oil Corp.,* 41 Cal.App.3d 246, 258 [115 Cal.Rptr. 902]; *Higson* v. *Montgomery Ward & Co.,* 263 Cal.App.2d 333, 341-342 [69 Cal.Rptr. 497].) Defendant assigned Sennes the title of entertainment director and placed his name on the Frontier Hotel marquee as the presenter of entertainment. Sennes routinely booked the entertainment for the Frontier Hotel, as he had done in Las Vegas hotels for 20 years. Sennes signed the contract on behalf of the hotel for Kerner's first production, "Let's Make Love." When plaintiff tried to speak to Danner, the managing director of the hotel, about producing "My Fair Lady," Danner told him to consult Sennes. From defendant's conduct plaintiff could reasonably conclude either that Sennes had written authority to enter all contracts for entertainment, including those

required to be in writing, or that defendant would not object to Sennes' lack of written authority.

*McGirr, supra,* compels no different result. In that case neither the trial nor appellate court found evidence to support a finding of estoppel: "In no way did Gulf [the principal] create an impression that Marks [the agent] had authority to enter into leases for more than one year or that whatever authority he had was in writing." (41 Cal.App.3d at p. 258.) The plaintiff in *McGirr* had no contact with any other representative of Gulf concerning the lease. Contrast the case at bench, where both defendant's managing directors, Schwind and Danner, were informed of the plan to present "My Fair Lady," and where plaintiff, when he tried to discuss the pending production with Danner, was referred back to Sennes.

Defendant argues that for the application of the doctrine of estoppel plaintiff must have suffered an unconscionable injury in reliance on Sennes' apparent authority. The evidence, however, shows such injury. (*Columbia Pictures Corp.* v. *DeToth,* 26 Cal.2d 753, 759-760 [161 P.2d 217, 162 A.L.R. 747].) After the 27 June 1968 agreement, plaintiff expended time and effort in arranging the contemplated production. He traveled to New York and Dallas to obtain the licenses, materials, and personnel needed for a successful production. Plaintiff need not establish an exact monetary value of injury to bring the doctrine of estoppel into play. (See *Wilk* v. *Vencill,* 30 Cal.2d 104, 107 [180 P.2d 351].)

Defendant also contends the trial court erred in failing to make a requested finding on the issue whether defendant represented to plaintiff that Sennes had written authority to bind defendant to contracts within the statute of frauds. However, a finding on that issue was unnecessary. (*Shelley* v. *Board of Trade,* 87 Cal.App. 344, 354 [262 P. 403].) The trial court's decision rested on its finding of an estoppel to raise the equal dignities rule:

"4. At all times from and after his said employment by defendant until approximately February 14, 1969, defendant delegated to Sennes and Sennes had and exercised the full authority of defendant to enter into contracts of entertainment at Frontier without the approval of any other person, including the negotiation and determination of the terms and conditions of any such contract and whether any such contract should be oral or in writing, formal or informal, or otherwise.

"Defendant, by its actions and conduct during said period as aforesaid, caused third parties, including plaintiff in entering into the contract hereinafter referred to for the production of "My Fair Lady" at Frontier, to rely upon the authority of Sennes to negotiate and enter into contracts of entertainment on behalf of defendant at Frontier. At no time did defendant notify plaintiff of any limitation upon the authority of Sennes to enter into such contracts at Frontier on behalf of defendant, and plaintiff had no knowledge of any such limitation.

"Said authority was not delegated to Sennes by defendant in writing, but was not required to be in writing by reason of the foregoing and because Sennes had and. exercised the full, actual, ostensible and apparent authority of defendant during said period to enter into such contracts on behalf of defendant without the approval. of any other person.

"By reason of the foregoing, defendant is estopped to deny the authority of Sennes to enter into said contract with plaintiff for the production of 'My Fair Lady' at Frontier, and to assert the equal dignities doctrine with respect to the authority of Sennes to enter into said contract on behalf of defendant.

"Sennes was authorized by defendant to enter into said contract for the production of 'My Fair Lady' at Frontier."

A finding on representation of authority would have been relevant only if the equal dignities rule were applicable.

■ Defendant next contends the evidence was insufficient to support the trial court's finding that defendant repudiated the contract. Defendant argues that Danner may have expressed doubts to plaintiff about staging "My Fair Lady" and may have declared an intent not to be bound, but he never distinctly, unequivocably, and absolutely repudiated the contract. (*Salot* v. *Wershow,* 157 Cal.App.2d 352, 357 [320 P.2d 926].)

The evidence supports the finding of repudiation. After the meetings in May 1969, Sennes reported to a Las Vegas newspaper that the Frontier would not present "My Fair Lady." Then, when plaintiff requested Maheu's aid, Danner wrote:

"At the conclusion of that last meeting, I got the impression that you felt that we were in some way obligated to you which completely

surprised me to say the least. . . . In any event, it is my belief at this time, that we will be better off staying with top name individual entertainers rather than either of the plays which you have offered us."

■ Defendant's final contention is that plaintiff's loss of potential profits from an assertedly untried and speculative business venture was as a matter of law too uncertain and contingent to form the basis for computation of damages. (*California P. Mfg. Co.* v. *Stafford P. Co.,* 192 Cal. 479, 485 [221 P. 345, 32 A.L.R. 114].) Again, the evidence supports the trial court's findings of damages. Loss of anticipated profits need not be established with certainty. It is sufficient to show a reasonable probability that profits would have been earned except for the breach of contract. (*Nelson* v. *Reisner,* 51 Cal.2d 161, 171-172 [331 P.2d 17].) Plaintiff an experienced entertainer, agent, and producer established his ability to complete his obligations under the contract. He had recently put together a show for defendant's hotel. He had negotiated an agreement for the rights to put on the promised production. He had arranged for a director and an artistic consultant, and he had initiated discussions to secure the remaining personnel.

Plaintiff also proved to a reasonable probability that his contract would have been profitable. He was to receive $75,000 a week, and several expert witnesses estimated his weekly costs at $55,000 a week or less. Defendant presented contrary evidence on the costs of production, but that evidence merely created a conflict for resolution by the trial court. (*Niles* v. *City of San Rafael,* 42 Cal.App.3d 230, 241 [116 Cal.Rptr. 733].) The trial court assessed damages at $10,000 a week for 26 weeks, less than half the amount plaintiff's expert testimony showed.

The judgment is affirmed.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied April 28, 1976. Compton, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied June 2, 1976.