**LANDES CONSTRUCTION CO., INC.,**
Plaintiff-Appellee/Cross-Appellant,

v.

**ROYAL BANK OF CANADA,**
Defendant-Appellant/Cross-Appellee.

Nos. 86–5603, 86–5611.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1987.

Decided Dec. 9, 1987.

Isaac M. Pachulski (argued) and Anthony Castanares, Stutman, Treister & Glatt, Los Angeles, Cal., Thomas N. Bucknell, Shulkin, Hutton & Bucknell, Inc., P.S., Seattle, Wash., for plaintiff-appellee/cross-appellant.

Howard P. Miller, Buchalter, Nemer, Fields, Chrystie & Younger, Los Angeles, Cal., for defendant-appellant/cross-appellee.

Before FERGUSON, BOOCHEVER and WIGGINS, Circuit Judges.

BOOCHEVER, Circuit Judge:

A jury found that the Royal Bank of Canada orally agreed to lend Landes Construction Company $10 million to finance the purchase of commercial real estate in Los Angeles and that the bank breached this agreement. It awarded the construction company $18.5 million in damages. The bank appeals the judgment and the district court's denial of the bank's motion for judgment notwithstanding the verdict and for a new trial. It argues that the district court's grant of four peremptory challenges to both parties at voir dire was reversible error. The bank also argues that there was insufficient evidence to establish the existence of a contract. Alternatively, the bank contends that if there was a contract, it was one within California's statute of frauds and thus unenforceable. Assuming the existence of a valid

enforceable contract, the bank claims that the district court erred in failing to grant J.N.O.V. or a new trial as there was insufficient proof of damages. Finally, if the evidence was sufficient to prove the contract and damages from its breach, the bank contends it was error for the district court to refuse a motion for an equitable offset against the damages awarded by a jury. Landes Construction Company cross appeals the district court's denial of prejudgment interest. We affirm the jury's verdict and the district court's rulings on the post-trial motions.

## FACTS

The claims of error made by the Royal Bank of Canada (RBOC or bank) involving the jury's verdict and the district court's rulings on the motions for a new trial and for judgment notwithstanding the verdict go to the weight of the evidence. In reviewing these alleged errors, we must view the evidence presented at trial from the perspective most favorable to Landes Construction Company (LCCO or construction company). *See Robins v. Harum*, 773 F.2d 1004, 1006 (9th Cir.1985); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013–14 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Walker v. KFC Corp.*, 728 F.2d 1215, 1223 (9th Cir.1984). Viewed in this manner, the facts are as follows.

Nat Landes was the sole shareholder of LCCO and Eliyahu Scheinberg was the sole shareholder of Elpat Holdings, Ltd. Together they had participated in several real estate ventures, notably the development of a golf course. William Neapole was a vice president of the bank. The bank provided some of the financing for development of the golf course; Neapole participated in the transaction.

In the spring of 1981, Landes learned of an opportunity to purchase eleven acres located at 5757 Wilshire Boulevard in Los Angeles. The sellers and LCCO reached a tentative purchase agreement requiring a $10 million down payment and a $40 million note and deed of trust in favor of the sellers. The sellers wanted assurances that LCCO could obtain the financing necessary to complete the sale. Landes had told them that neither he nor his company had sufficient resources to purchase the property and he would therefore join with Scheinberg, who would arrange financing. Scheinberg contacted RBOC through Neapole and another of its officers, David Maltby. The bank expressed interest in the project, and Neapole and Don Palethorpe, a real estate specialist with the bank, accompanied Scheinberg to California to meet with Landes and the sellers.

Landes met Scheinberg and Neapole in San Francisco on June 14, 1981. Neapole questioned Landes about the property, the plan for its development, the terms of the agreement with the sellers, and Landes' experience with previous development projects. At dinner, Neapole told Landes, "We are going to lend you $10 million for this project." The next day, Landes, Scheinberg, Neapole, and Palethorpe met with the representative of the owners of the property. The owners' representative informed them that he was authorized to enter into a purchase agreement if he was convinced that LCCO had "the capacity to carry this out." Neapole assured him that the bank would provide the financing. The parties then signed a purchase agreement that called for an initial payment of $1 million, another payment of $2 million in thirty days, and the remaining $7 million of the $10 million down payment in another fifty days. If LCCO did not make the final payment of $7 million, the $3 million would be treated as consideration for an option on the property and would be forfeited to the owners.

On June 19, 1981, Scheinberg met with Neapole to negotiate the terms of the $10 million loan from the bank to the construction company. LCCO would pay interest at the rate of "prime plus two," a fee of $3 million after the sale closed, and Landes and Scheinberg would personally guarantee the loan. The construction company paid the first two installments on the down payment as they became due in June and July. The bank transferred these funds to LCCO at Scheinberg's direction. The total

of $3 million was advanced against Elpat's line of credit. The bank had financed another project of Landes and Scheinberg, a golf course, in the same manner: the bank advanced funds against Elpat's established credit line until the paperwork for the project's own credit was completed. Then Elpat was repaid and the debt transferred to the project's credit line.

In early August, the architectural firm retained by Landes presented the development plans for the property to representatives of the bank, the Los Angeles planning commission, and others. A similar presentation was made to officers of RBOC in Calgary. Neapole prepared an application for a loan of $22.5 million: $7 million would go to complete the down payment; the remainder was earmarked for development and payment of interest and fees. The bank rejected the application on September 4, 1981, five days before the $7 million installment was due. The construction company was unable to arrange other financing and the $3 million was forfeited to the sellers under the terms of the purchase agreement.

At trial, LCCO asserted that RBOC had made an oral promise to lend it $10 million to finance the down payment. The construction company presented evidence to support two alternative measures of its damages. Its expert witness testified that the project, if developed, would have generated profits with a present value of $79.6 million in 1985. Other evidence indicated that the property could have been immediately resold in September 1981 for $29–40 million more than the price agreed to in the purchase agreement. The jury found for LCCO and returned a general verdict against RBOC for $18.5 million.

The bank made motions for a new trial or judgment notwithstanding the verdict alleging that there was insufficient evidence on the questions of the existence of an oral contract and damages for its breach to permit the case to go to the jury. It also argued that even if there were sufficient evidence to create a jury question on the making of an oral agreement, such an agreement is barred by California's statute

of frauds. Finally, it made a motion for an equitable offset of $3 million against the jury's verdict for the monies it had advanced for the down payment. The construction company made a motion for prejudgment interest on the verdict. The trial judge denied all the post trial motions. On appeal, the parties claim the district court erred in ruling on their respective motions. RBOC also asserts that the court committed reversible error by granting a fourth peremptory challenge at voir dire.

## ANALYSIS

### Peremptory Challenge

■ The trial court informed the parties that jury selection would follow the local procedure which holds that each acceptance of a jury panel by a party waives one of the peremptory challenges allowed it under 28 U.S.C. § 1870 (1982). Counsel for LCCO, Castanares, accepted the first panel called. Berle, counsel for RBOC, excused juror No. 3 and the court called a replacement. Castanares accepted the panel again. Berle excused juror No. 4 and Castanares excused the replacement juror. Berle then challenged juror No. 1 and the court called as a replacement, a loan officer at a Los Angeles bank. Castanares challenged her for cause. The court expressed its reluctance to excuse her for cause. Castanares then asked that the court allow each side an additional challenge. Judge Rymer granted this motion over Berle's objection.

In *United States v. Turner*, 558 F.2d 535 (9th Cir.1977), the court held that "acceptance of a panel cannot be deemed a waiver of a peremptory challenge in respect of [sic] a person who was not a member of the panel at the time the jury was accepted." *Id.* at 538. Castanares' acceptances of the panel did not waive his right to an otherwise unexhausted peremptory challenge against the loan officer, who was not a member of the panel when he did accept it. *Id.; see also United States v. Pimentel,* 654 F.2d 538, 541 (9th Cir.1981).

### Statute of Frauds

■ LCCO contends that the bank is precluded from raising a statute of frauds

argument on appeal because the bank did not seek a directed verdict on this ground. The trial court noted the bank's failure to include this issue in its motion for a directed verdict, but ruled that the statute did not apply for two reasons: (1) there was no evidence that the construction company promised to give the bank a security interest in the property, and (2) even if it had, California does not apply its statute of frauds to an entire contract simply because one of its promises falls within the statute. The court clearly erred in ruling that there was no evidence demonstrating LCCO's promise to give a security interest in the property. LCCO does not dispute that Landes testified that he was to convey a deed of trust as security. When the material facts are not in dispute, the question of whether a contract is within the statute of frauds is a question of law, *Johnson v. Auran*, 214 N.W.2d 641, 651–53 (N.D. 1974); 37 C.J.S. *Frauds, Statute of*, § 290 (1943 & Supp.1987), which we review de novo. As long as a party properly raises an issue of law before the case goes to the jury, it need not include the issue in a motion for a directed verdict in order to preserve the question on appeal. The bank filed a motion in limine in which it asserted the defense of the statute of frauds. The issue is therefore properly before us on appeal. *See McGirr v. Gulf Oil Corp.*, 41 Cal.App.3d 246, 252, 115 Cal.Rptr. 902, 905 (1974); *Arneson v. Webster*, 226 Cal. App.2d 370, 377, 38 Cal.Rptr. 88, 92 (1964); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2540, at 617 (1971).

 An oral agreement to lend money with which to purchase real property clearly falls outside California's statute of frauds. Cal.Civ.Code § 1624 (West 1985 &

Supp.1986); Cal.Civ.Proc. Code § 1971 (West 1983). But an oral agreement to grant a lien against real property as security for a debt is within the statute. *Remainders, Inc. v. Bartlett*, 215 Cal.App.2d 295, 298–99, 30 Cal.Rptr. 191, 193–94 (1963). The bank argues that section 1971 of the California Code of Civil Procedure brings within the bar of the statute any oral agreement in which one of the promises is to convey an interest in real estate. California case law, however, holds that when promises not within the statute of frauds are coupled with one that is, the former are enforceable if they are divisible or separable. *White Lighting Co. v. Wolfson*, 68 Cal.2d 336, 345–46, 66 Cal.Rptr. 697, 702–03, 438 P.2d 345, 350–51 (1968); *Pollyanna Homes, Inc. v. Berney*, 56 Cal. 2d 676, 678–79, 16 Cal.Rptr. 345, 346, 365 P.2d 401, 402 (1961); *Magee v. McManus*, 70 Cal. 553, 557, 12 P. 451, 453 (1886). This rule comports with the state's policy of restricting the application of the statute to those situations precisely covered by its language. *White Lighting*, 68 Cal.2d at 346, 66 Cal.Rptr. at 703, 438 P.2d at 351. Because the jury found for LCCO, we must assume that it concluded LCCO made promises to pay interest and loan fees and to repay the principal in addition to its promise to grant RBOC a security interest. The former are separable from the latter and therefore are not barred by the statute of frauds.[1]

*Judgment Notwithstanding the Verdict*

Denial of a motion for judgment notwithstanding the verdict results in the appeal being taken from the judgment entered on the verdict. Thus, the standard of review for denial of J.N.O.V. is the same as the standard for reviewing a jury verdict: both

---

1. Our holding that the promise to convey a deed of trust is divisible from the other promises of the loan would not permit LCCO to use the statute of frauds as a means to avoid granting the security interest if the bank had lent the remaining $7 million or if LCCO had sought specific performance of the oral agreement. Under California law, the doctrines of part performance and estoppel would prevent the construction company from asserting the statute in these situations. *See, e.g., Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 27–28, 216 Cal.Rptr. 130, 134–35, 702 P.2d 212, 216–17 (1985); *Redke v. Silvertrust*, 6 Cal.3d 94, 100–01, 98 Cal.Rptr. 293, 296–97, 490 P.2d 805, 808–09 (1971), *cert. denied*, 405 U.S. 1041, 92 S.Ct. 1316, 31 L.Ed.2d 583 (1972); *Macmorris Sales Corp. v. Kozak*, 263 Cal.App.2d 430, 442, 69 Cal.Rptr. 719, 725–26 (1968); *Doke v. Brockhurst*, 150 Cal.App.2d 514, 516–17, 310 P.2d 43, 45–46 (1957); *Monarco v. Lo Greco*, 35 Cal.2d 621, 220 P.2d 737 (1950); *Tobola v. Wholey*, 75 Cal.App.2d 351, 357–58, 170 P.2d 952, 956 (1946).

the verdict and the denial of the motion must be affirmed if there is substantial evidence to support the verdict. *See Transgo*, 768 F.2d at 1013–14. Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence. *St. Elizabeth Community Hosp. v. Heckler*, 745 F.2d 587, 592 (9th Cir.1984). Neither the trial court nor we may weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists. *Transgo*, 768 F.2d at 1024; *Walker*, 728 F.2d at 1223; *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir.), *cert. denied*, 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed. 2d 265 (1984).

■ As this was a suit on an oral contract, the trial consisted of little more than a swearing contest. As our recitation of the facts show, Landes testified that Neapole told him the bank would lend LCCO $10 million. Scheinberg testified that he and Neapole reached an agreement on the essential terms of the loan contract for the down payment. Neapole denied both of these assertions. Neither party disputes that the various meetings occurred, that the bank advanced $3 million, that these funds went to the sellers, or that LCCO was the buyer named in the purchase agreement. The bank's attacks against the verdict center on what inferences should be drawn from this and other evidence in the record. One reasonable inference, however, is that the bank promised to lend the construction company the $10 million for the down payment. Accordingly, we must affirm the jury's verdict and the district court's denial of a J.N.O.V.

*New Trial*

The bank argues that it is entitled to a new trial because (1) the verdict is against the clear weight of the evidence; (2) the court erred in admitting evidence of lost profits; and (3) the court failed to grant the bank's request for a special verdict.

(1) Clear weight of the evidence

■ If there is substantial evidence presented at trial to create an issue for the jury, a trial court may not grant a motion for a directed verdict or for judgment notwithstanding the verdict. The existence of substantial evidence does not, however, prevent the court from granting a motion for a new trial pursuant to Fed.R.Civ.P. 59 if the verdict is against the clear weight of the evidence. The court's power is clear in this regard; the discretion it should use in exercising this power is not.

■ The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party. *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1302 (9th Cir.1978); *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir.1957), *cert. denied*, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958). But after weighing the evidence, the trial judge faces a difficult task:

It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions [for a new trial on the grounds that the verdict is against the clear weight of the evidence]. Necessarily all such formulations are couched in broad and general terms that furnish no unerring litmus for a particular case. On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case. If, having given full respect to the jury's findings,

the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48–49 (1973) (footnotes omitted); *see Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1347 (9th Cir.1985); *City of Phoenix v. Com/Systems, Inc.,* 706 F.2d 1033, 1036 (9th Cir.1983); *Angle v. Sky Chef, Inc.,* 535 F.2d 492, 494 (9th Cir.1976).

 We review the trial court's decisions on motions for a new trial on the grounds that the verdict is against the clear weight of the evidence for an abuse of discretion. *Transgo,* 768 F.2d at 1014. We may not weigh evidence or assess the credibility of the witnesses. *Palmer Coking Coal Co. v. Director, Office of Workers' Comp. Programs,* 720 F.2d 1054, 1058 (9th Cir.1983). We will reverse denials of such motions for new trials in only four strictly limited situations: (1) the trial court believes it lacks the power to grant a new trial, *see Byrd v. Blue Ridge Rural Electric Coop., Inc.,* 356 U.S. 525, 540, 78 S.Ct. 893, 902, 2 L.Ed.2d 953 (1958); (2) it concludes that it may not weigh the evidence, *see Moist Cold Refrigerator Co.,* 249 F.2d at 256; (3) it weighs the evidence explicitly against the wrong standard, i.e., substantial evidence or preponderance of the evidence, *see id.;* or (4) it concludes the verdict is against the clear weight of the evidence but refuses to grant a new trial, *see Fenner v. Dependable Trucking Co.,* 716 F.2d 598, 602 (9th Cir.1983) (rather than grant a new trial, judge tried to force parties to accept a remittitur). As we cannot weigh the evidence for ourselves, we will reverse a denial of a new trial if we find one of these four errors or if the record contains no evidence in support of the verdict. *Farley Transp.,* 786 F.2d at 1347.

 The bank argues that Judge Rymer did not weigh the evidence for herself, especially the credibility of the construction company's witnesses, when she ruled on the motion for a new trial. RBOC mischaracterizes the judge's consideration of its motion:

No errors of law or in the conduct of the trial are claimed. Thus what defendant in effect asks the Court to do, is sit as the thirteenth juror and reach a different result. Had I been sitting on the jury, I might have; at the same time, having sat through the trial where the main issue was, was there a contract— and where testimony on that issue was conflicting and the credibility of all those who were percipient was on the line and before the jury, I believe it inappropriate to second guess the trier of fact, *at least where I cannot say with assurance (as I cannot in this case) that they could not reasonably have found Landes, Scheinberg and Glikbarg more credible than Neapole or plaintiff's theory more compelling than defendant's.*

Order of Dec. 19, 1985 at 8 (emphasis added) (citation omitted). The judge concluded that it was not unreasonable for the jury to believe LCCO's witnesses instead of RBOC's. Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake. *See Tennant v. Peoria & Pekin Union Ry.,* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944) ("Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.").

(2) Admission of evidence on lost profits

 The construction company presented two measures of its damages: lost profits ($79.6 million), and the difference between the purchase price and fair market value ($29 million). The former measure was calculated as present value at the time of the trial; the latter measure was calculated at the time of the breach. The jury awarded $18.5 million.

The bank makes a strong argument that the evidence of lost profits was speculative and should not have been admitted. LCCO never asserted that RBOC promised to provide development financing. The construction company was unable to obtain financing for the remaining $7 million after the

bank refused to provide it; this failure was, however, at least in part a result of the lateness of the breach, which left LCCO with but one week of its option to arrange financing. Nevertheless, it is speculative to assume that LCCO could have obtained development financing of approximately $95 million, especially as neither LCCO nor Scheinberg had any equity in the property.

Even if the project had been developed exactly as LCCO envisioned, the realization of profits still appears uncertain. Dr. Tennenbaum, LCCO's expert economist, testified that the present value of the project's income stream for ten years would be $79.6 million in 1985. To reach that conclusion, he had to (1) estimate the construction costs, (2) assume that the mortgagee would consent to some roll over of the mortgage in the project's early years, (3) predict tax rates, interest rates, occupancy rates, and rents for the period 1981–1991, and (4) predict the resale value of the building in 1991. Relatively small changes in these predictions, estimates, and assumptions make for large changes in the present value of the income stream. For this reason, courts have been reluctant to admit evidence of lost profits for real estate ventures. *See Engle v. City of Oroville*, 238 Cal.App.2d 266, 47 Cal.Rptr. 630 (1965); *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 278 A.2d 12, *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971).

■ Assuming, arguendo, that the trial court erred in admitting this evidence, we conclude that it is harmless error. The jury verdict, $18.5 million, is much less than either measure of damages presented by LCCO. In addition, the bank failed to make a timely request for a special verdict. When a jury returns a general verdict for the plaintiff after hearing alternative calculations of damages, we uphold the award if there is substantial evidence in the record as to any one calculation to support the award. *See Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1317 (9th Cir.1982), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982); *Bank of America*

*Nat'l Trust & Sav. Ass'n v. Hayden*, 231 F.2d 595, 602–03 (9th Cir.1956); *see also Raynor Bros. v. American Cyanimid Co.*, 695 F.2d 382, 385 (9th Cir.1982) (a jury's verdict will not be set aside simply because the damages awarded do not correspond to any particular calculation presented to the jury).

We are not presented with the interplay of a general verdict and alternative theories of liability. This circuit's procedure when the appellate court concludes one of the liability theories is unsupported by substantial evidence is not clear. *See Syufy Enter. v. American Multicinema, Inc.*, 793 F.2d 990, 1001–02 (9th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987); *see also Niles v. United States*, 520 F.Supp. 808, 811–12 (N.D. Cal.1981) (treating the evaluation and review of general verdicts as a question of state law in diversity cases), *aff'd*, 710 F.2d 1391 (9th Cir.1983). The correct procedure appears to be a remand for a new trial. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962); *United N.Y. & N.J. Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959). Even if this is the procedure for a failure of proof as to a theory of liability, we conclude that a failure to prove one measure of damages need not be treated the same way. Proof of damages is governed by a less strict standard than proof of liability. *See Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). The latter involves past events; the former almost invariably relies on speculation about the future. Where a party cannot, as RBOC cannot, make a strong showing that presentation of the alternative measure prejudiced the outcome, we conclude that proper respect for the role of the jury and the discretion of the trial judge favors construing a general verdict in behalf of the prevailing party.

(3) Denial of the request for a special verdict

In ruling that an appellate court must construe a general verdict in favor of a

prevailing party when alternative theories of damages are presented, the Ninth Circuit has stated:

> No separate verdict as to each cause of action, no interrogatories or special verdict were requested or submitted to the jury. Consequently the verdict is to be construed as responsive to any and all material issues in the case, including the alternative theory of damages.

*Hayden,* 231 F.2d at 602 (citations omitted). Several commentators suggest that a trial court's decision whether to use a special verdict should not be reviewed. 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 49.03, at 49–10 to 49–13 (notes that court's decision "should not be reviewable, except, perhaps, for gross abuse, which can rarely be shown"); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2505, at 493 ("there ought never be a reversal for use or nonuse of special verdicts"). On its face, Rule 49(a) grants wide discretion on the use of special verdicts to the trial court: the court may use whatever form of verdict "it deems most appropriate." Fed.R.Civ.P. 49(a). This circuit, without discussion of the issue of reviewability, did review the denial of a motion for a special verdict under the abuse of discretion standard, but quickly affirmed the denial without reservation. *Cancellier,* 672 F.2d at 1317.

█ Here we find no abuse of discretion in the trial court's decision on the form of the verdict. The court had ordered that special verdicts must be submitted seven days before trial; Local Rule 13.4.1 of the Central District of California requires requests for special verdicts be filed five days before trial. Although use of a special verdict was mentioned several times in response to concerns about the speculative nature of the evidence on lost profits, RBOC did not submit a request until after the jury had retired. At this time, the trial court did suggest that it might consider

using a special verdict because it appreciated the problem we might face in reviewing a general verdict for LCCO.[2] But when counsel failed to agree on the form, the court decided against it because "at this point is probably also not an appropriate time to be ringing [sic] our hands over it. I guess the general verdict problem—the special interrogatory problem ought to have been raised before.... So I'll just send in the general verdict form and we'll let the chips fall where they may." Transcript of Sept. 5, 1985 at 23.

█ The form of the verdict should be decided before closing argument so that counsel may structure their arguments, and the court its instructions, accordingly. *See Sakamoto v. N.A.B. Trucking Co.,* 717 F.2d 1000, 1006 (6th Cir.1983). The failure to follow this practice may constitute reversible error. *See id., Smith v. Danyo,* 585 F.2d 83, 88 (3d Cir.1978). Although a special verdict would have been appropriate in this case, we conclude that the trial court did not abuse its discretion in light of the lateness of the request.

*Denial of a $3 Million Equitable Offset*

█ The bank made a post trial motion for a reduction of the jury award by $3 million to offset the funds it had advanced to LCCO. It contends that it could not claim an offset until the jury determined there was a contract because a party may not argue inconsistent facts under Fed.R. Civ.P. 8 and 11. This argument is specious. The existence of a contract is a question of law and fact, and Fed.R.Civ.P. 8(e)(2) specifically permits a party to plead alternate and inconsistent defenses. In addition, LCCO lost the opportunity to argue that it received no benefit from the $3 million as the funds were forfeited to the sellers because of RBOC's breach and that the bank knew of the forfeiture provision in the purchase agreement. It appears

---

**2.** The prescience of the trial court is startling:

> For example, if the jury came in with a 17 million dollars number and the motion for a new trial is in part based upon error in permitting the jury to consider lost profits evidence, it would be—it might be very difficult

> or impossible to know whether that $17 million was based on [the lost profits] theory, or, rather, was based on a fair market value theory and they just happen to disagree with the experts on what constitutes fair market value. Transcript of September 5, 1985 at 6–7.

that RBOC is trying to avoid the consequences of its trial strategy: consistent denial of the existence of an enforceable contract with LCCO. The trial court did not abuse its discretion in denying this motion.

*Cross Appeal for Prejudgment Interest*

 The construction company cross appeals, contending that it is entitled to pre-judgment interest on the award. California Civil Code § 3287(b) provides that a party entitled to a judgment on an unliquidated claim "may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." *Esgro Central v. General Ins. Co.*, 20 Cal.App.3d 1054, 98 Cal.Rptr. 153 (1971), indicates that the trial court has broad discretion under this statute. In *Esgro*, the trial court considered that the plaintiff had received a "very, very substantial judgment," 20 Cal.App.3d at 1065, 98 Cal.Rptr. at 160. The court of appeals concluded, in affirming the denial of pre-judgment interest, that the judge "was of the opinion that the jury had already considered that item in awarding damages." 20 Cal.App.3d at 1065, 98 Cal. Rptr. at 161. Similarly, the trial court in this case, after "considering all the circumstances," concluded that the award was adequate. The calculation of damages based on lost profits was adjusted to its present value at the time of trial. The construction company concedes that if the award was based on lost profits, it would not be entitled to pre-judgment interest. Because the jury may have considered the evidence of lost profits, the award may reflect present value as of the time of trial. The construction company may not use our deference to the general verdict and the trial court's decision on admitting evidence of lost profits as a knife to dissect the award. If LCCO wished to ensure pre-judgment interest for an award based on the difference between the purchase price of the property and its fair market value in 1981, it should have agreed to the use of a special verdict. We hold that the trial court did not abuse its discretion by denying pre-judgment interest, even though it may have considered factors that are irrelevant under section 3287(b). *See In re Pago Pago Aircrash of January 30, 1974*, 525 F.Supp. 1007, 1015 (C.D.Cal.1981).

CONCLUSION

The jury verdict is supported by substantial evidence. The only possible error of law that we find in this ably conducted trial was admission of the evidence of lost profits. In light of the facts of this case and the use of a general verdict, this alleged error is harmless. The trial court did not abuse its discretion in ruling on the post-trial motions for a new trial, an equitable offset, or pre-judgment interest. Accordingly, the judgment is

AFFIRMED.