**SOUTHERN UNION COMPANY,**
a Delaware corporation,
**Plaintiff,**

v.

**SOUTHWEST GAS CORPORATION,**
a California corporation, et al.,
**Defendants.**

**No. CV–99–1294–PHX–ROS.**

United States District Court,
D. Arizona.

Aug. 27, 2003.

N Warner Lee, Esq, William B. McManus, Esq, Ryley Carlock & Applewhite PA, Robert E. B. Allen, Esq, Charles Steven Price, Esq, Barry R. Sanders, Esq, Allen Price & Padden PLC, Phoenix, AZ, Eric D. Herschmann, Jessica Mann, Michael M. Fay, Kasowitz Benson Torres & Friedman LLP, New York, NY, Tom Q. Ferguson, Shelly L. Dalrymple, Sam P. Daniel, Jr., Doerner Saunders Daniel & Anderson, Tulsa, OK, Christina Carlson Dodds, Daniel W Bishop, II, Daniel W Bishop II PC, Austin, TX, Thomas Anton Mauet, Tucson, AZ, for Plaintiff.

Michael J O'Connor, Esq, Richard R Thomas, Esq, Douglas F Behm, Michael Scott McCoy, Esq, Michael J Farrell, Jennings Strouss & Salmon PLC, Phoenix, AZ, Seth Aronson, Esq, Marc F Feinstein, Patrick Lynch, Floy E Andrews, O'Melveny & Myers LLP, Angeles, CA, Michael R Klein, Steven F Cherry, Howard M Shapiro, David P Donovan, Wilmer Cutler & Pickering, Washington, DC, Michael J Bowe, Kasowitz Benson Torres & Friedman LLP, New York, NY, Thomas R Sheets, Southwest Gas Corporation, Las Vegas, NV, Paul J Cleary, Scott R Rowland, Boone Smith Davis Hurst & Dickman, Tulsa, OK, Steve Morris, Kristina Pickering, Morris Pickering & Sanner, Las Vegas, NV, Mark M Deatherage, Esq, Michael K Kennedy, Esq, Tom Henze, Esq, Gallagher & Kennedy PA, Phoenix, AZ, John J Swenson, Esq, Richard Joseph Doren, Esq, Thomas E Holliday, Gibson Dunn & Crutcher LLP, Los Angeles, CA, John Henry Rule, Oliver Sterling Howard, Thomas James Kirby, David E Keglovits, Amelia A Fogleman, Gable & Gotwals, Tulsa, OK, David J Damron, Esq, Shannon M Ivanyi, Victoria P Skinner, Sanders & Parks PC, Michael A Beale, Esq, Keith Thomas Slack, Esq, Beale Micheaels & Slack PC, Samuel Brett Benham, Phoenix, AZ, C Stanley Hunterton, Hunterton & Associates, Las Vegas, NV, Michael P Anthony, Esq, Carson Messinger Elliott, Laughlin & Ragan PLLC, Phoenix, AZ, Michael W Sillyman, Esq, Brian Jay Schulman, Kutak Rock LLP, Scottsdale, AZ, Edward Jeffrey Walsh, Esq, Greenberg Traurig LLP, Phoenix, AZ, Barry Richard, Greenberg Traurig PA, Tallahassee, FL, Louis A Stahl, Esq, Quarles & Brady Streich Lang LLP, Phoenix, AZ, Michael D Kimerer, Esq, Thomas V Rawles, Esq, Kimerer & Derrick PC, Phoenix, AZ, Michael L Piccarreta, Esq, Piccarreta & Davis PC, Tucson, AZ, Mark M Deatherage, Esq, Tom Henze, Esq, Phoenix, AZ, John Henry Rule, Oliver Sterling Howard, Thomas James Kirby, Gable & Gotwals, Tulsa, OK, David G Derickson, Esq, William Ridgeway Harrison, David G Derickson PC, Phoenix, AZ, for Defendants.

### Opinion

SILVER, District Judge.

On December 18, 2002, the jury returned a verdict for Plaintiff Southern Union Company ("Southern Union" or "SUG") against Defendant James Irvin ("Irvin" or "Commissioner Irvin"). This Order summarizes and explains a number

of evidentiary rulings made during trial and the Court's decision to deny Irvin's Motion for Judgment Notwithstanding the Verdict. In particular, on December 10, 2002, the Court held a hearing and issued final rulings on the admissibility of certain evidence raised during the cross-examination of Commissioner Irvin. The Court allowed Plaintiff Southern Union to question Irvin on notes written by his wife, Carol Irvin, in October 2002, and on the Clean Elections Act Qualifying Contribution Form ("Qualifying Contribution Form" or "Contribution Form" or "Form") signed by Irvin in May 2002 under penalty of perjury. The Court promised a written opinion would follow. This is that opinion.

## I. Background

On December 18, 2002, after a jury trial of nearly two months, the jury returned a verdict for Plaintiff Southern Union Company ("Southern Union") against James Irvin, the only remaining Defendant at the conclusion of trial.[1] Plaintiff prevailed on both causes of action, intentional interference with business expectancy and intentional interference with contractual relations, caused by Irvin's improper and wrongful activities in early 1999 to bring about the merger between Southwest Gas Corporation (SWG) and ONEOK, Inc. instead of SWG and Plaintiff. The evidence of wrongful conduct established that Irvin, a Corporation Commissioner at the time of the activities relating to the merger, was instrumental in ensuring that ONEOK rather than the Plaintiff was the chosen merger partner by the SWG Board of Directors.

During cross-examination of Defendant Irvin, Plaintiff was allowed to pursue questioning on two issues.[2] First was the notes of a purported conversation Carol Irvin, the wife of Commissioner Irvin, had with Jack Rose in July 1999 and her statement of an alleged event she witnessed in 1999, that was memorialized in the statement. The two separate documents ("the Carol Irvin notes") were initially brought to the Court's and to counsels' attention by Irvin's counsel on October 24, 2002 and proffered as new and material evidence. After Southern Union informed counsel and the Court that a forensic examiner would be proffered to testify to his opinion regarding when the notes were prepared, the following afternoon counsel for Irvin withdrew the notes as possible evidence. The second issue was evidence that Irvin had been untruthful in signing a Qualifying Contribution Form from a supposed contributor, Ken Dickson, who swore that he never contributed money to Irvin despite the express statement on the form to the contrary. Plaintiff sought to introduce Irvin's false statements on the Contribution Form as impeachment evidence.

## II. The Carol Irvin Notes

On October 24, 2002, the week before trial began, Irvin's counsel informed the

---

1. Jack Rose was a Defendant at the beginning of and throughout the trial, until closing arguments at which time he reached a settlement with Plaintiff on December 13, 2002. Rose invoked his Fifth Amendment privilege against self-incrimination before and during trial and therefore did not testify about his activities in early 1999 or the alleged phone conversation with Carol Irvin in 1999.

2. At a hearing held Sunday, December 8, 2002, after the Carol Irvin notes and Clean Elections form issues concerning Irvin's testimony had been raised during trial but before Irvin resumed the stand, the Court gave clear notice to Irvin's counsel of decisions on the admissibility of this evidence. Tr. 4918–22. The Court gave warning to the parties, "I am telling you this today because I want you to certainly confer with [Commissioner Irvin] before he [retakes] the stand ... and after you've had a chance to brief the issues which I've presented to you." Tr. at 4920. Then the Court informed counsel that inquiry into the two areas of contention would be allowed if Irvin resumed his testimony.

Court in the late evening that new evidence had been discovered and would be offered at trial. This evidence included two pages of notes written by Carol Irvin dated "7–31–99." The notes described a telephone conversation between Carol Irvin and Defendant Jack Rose, an assistant to Irvin at the time of the failed merger, occurring on July 31, 1999, and the notes were represented as made "contemporaneously" with the 1999 conversation. The notes unambiguously expressed that Rose allegedly informed Ms. Irvin of his sentiment and opinion, that he was principally involved in working on the merger while "Jim [Irvin was] not involved." The notes continued, in part, to exculpate Irvin with Rose's alleged remarks that "Jim [Irvin] did nothing wrong—Jack working with others to bring Oneok to AZ. Jim not involved—trusted Jack to do research.... Jack did a lot without Jim knowing cuz Jim busy at Commiss. Jack working in AZ Best interest. When will Jim be home—Jack needs to tell Jim s-o-o much he doesn't know! .... Call me anytime! I'm there for you! Don't worry—we did nothing wrong."

Further, the notes were written on the back of unrelated documents dated March 30, 1998 and April 8, 1998, which gave credence to the statement of Irvin's counsel that the notes were made in 1999, contemporaneously with the phone call. Concomitantly, the written statement of an event occurring in 1999, which was represented as drafted by Carol Irvin two weeks prior to the October 24 hearing, was written on blank paper. This feature further supported the proposition that the notes, in contrast, were made contemporaneously during the Rose conversation. Also, the notes are not complete sentences but are unconnected words or phrases appearing as if Carol Irvin was listening to Rose speak and hurriedly taking down the meaning of the statements. In comparison, however, the memorandum of the event in 1999 was written with complete sentences and appropriate paragraphs as if written in thoughtful recollection of that event.

After Irvin's counsel presented the notes to the Court and opposing counsel, the Court ordered Irvin's counsel to produce the documents for inspection by Plaintiff's and Rose's counsel. On October 31, 2002, Plaintiff's counsel requested an opportunity to conduct a forensic examination of the notes, and the Court granted the request. In the morning of November 1, 2002, counsel for Irvin phoned the Court and requested an emergency hearing that day, which was held the same afternoon. At the telephonic hearing, Irvin's counsel began with the assertion that "there was considerable confusion on the communication on those notes." Transcript ("Tr.") at 1286. He then retracted his earlier statement that the notes of the 1999 conversation between Rose and Carol Irvin had been made "contemporaneously" at the time of the phone call. He elaborated, stating that the notes had actually been prepared by Carol Irvin sometime the week before October 24, at the same time she prepared the statement memorializing the event she witnessed in 1999, and apologized for his misunderstanding of Carol Irvin's description of the notes. *Id.* at 1289. Essentially, he explained that when she used the word "original" in describing the notes she did not mean that they were contemporaneously written during the conversation with Rose.

The testimony of Carol Irvin was given at a hearing convened to determine if Commissioner Irvin and Carol Irvin fabricated evidence with the intent that his lawyers use it in his defense, and concomitantly whether it would be admitted at trial. The Court learned for the first time that Carol Irvin claimed that she did take notes contemporaneously during the con-

versation with Rose in 1999, but that on October 23, 2002 she recopied them on another piece of paper, and then destroyed the original. She gave no credible explanation for, on the eve of trial, recopying the original notes three years after they were written, and then destroying the originals. She gave no credible reason for the Court to dismiss the obvious indicia supporting the first proposition of Irvin's lawyers, that she clearly told Irvin's counsel that the notes were the original notes made at the time she spoke to Rose. Left unanswered was why the recent copying of the original notes was mysteriously written on paper with the date 1998 on the back? Concomitantly, why the statement memorializing the 1999 event prepared at the same time the notes were prepared was written on a blank piece of paper? Further, she offered no believable reason for copying the notes using unconnected phrases which resembled the writing of a person attempting to memorialize the content of a conversation *while it was occurring*. Finally, conspicuously absent was an explanation for the highly suspicious retraction of Irvin's counsel's initial emphatic description of the notes as contemporaneously made, swiftly following SUG's announcement that a forensic expert was prepared to testify precisely when they were written. Carol Irvin's testimony in support of her allegation that she recopied and then destroyed the original notes was composed of tenuous assertions strung together by strands of surmise and illogic. Apparently counsel for Commissioner Irvin also had doubts regarding the plausibility of how and why the notes were created and destroyed, because despite Carol Irvin's under oath explanation, Irvin's counsel opted to withdraw the notes from evidence.

■ Thereafter, Plaintiff sought admission of evidence establishing that Defendant Irvin and his wife fabricated evidence material to his defense and then offered it through counsel for admission at trial. Over the course of the trial the Court found the evidence sufficient pursuant to Federal Rule of Evidence 104 for the jury to find that Defendant Irvin had engaged in fabricating evidence favorable to his defense and then offering it as evidence in the trial. Further, the Court held that if the jury found that Commissioner Irvin attempted, through his counsel, to have admitted into evidence fabricated and arguably exculpatory evidence, the attempt was relevant to whether Irvin had the state of mind required for both causes of action. Both are intentional torts, alleging in particular a variety of deceitful and fraudulent acts committed by Irvin to accomplish the goal of a ONEOK–SWG merger. Also, the jury could have found that the same acts demonstrated his consciousness of the wrongdoing alleged in both causes of action. Hence, cross-examination of the extent of Irvin's involvement in the acts was relevant to determine his credibility.

Central to the Court's decision that this evidence was admissible against Irvin are four factors: Carol Irvin testified that Irvin knew about the notes before she disclosed them to his counsel, and the evidence established that he was present at the November 1 meeting when the decision was made to withdraw the notes from evidence. Also, during cross-examination, Irvin testified that his wife "made mention" of her notes from the 1999 Rose conversation on the night of October 23, and that he directed her to call his counsel the same night to discuss them along with the issues concerning the trial. *Id.* at 6084; Tr. 12/6/02 at 4789–90. Then, on the morning of October 24, Commissioner Irvin took the notes in an envelope from Carol Irvin and delivered them to his counsel. Of critical significance was the inconsistency of the testimony between Carol Irvin, who testified that she told her

husband the notes were of her conversation with Rose, and Irvin's testimony minimizing her statement by telling the jury that he could not recall if his wife had told him what was in the package. Tr. 12/13/02, at 6070–1, 6073.

Because the Court held that the jury could have found that Irvin was involved in these acts, the evidence was admitted with a clarifying instruction. The instruction given was "[e]vidence that defendant Irvin offered fabricated evidence to the Court that he believed would be favorable to his defense, are circumstances that, if proven, may be considered by the jury as showing consciousness of wrongdoing on the part of defendant Irvin." Instruction No. 20 [Doc. # 2196]. Both causes of action are intentional torts, requiring proof of "improper motive," allegedly signified by Irvin's deceit and concealment. Fabrication of evidence followed by offering it at trial because it was material to his defense is specifically relevant to whether he intentionally engaged in improper conduct, and whether he testified truthfully. *See United States v. Perkins*, 937 F.2d 1397, 1401–2 (9th Cir.1991) (false exculpatory statements may be considered by jury as evidence of consciousness of guilt); *United States v. Collins*, 90 F.3d 1420, 1428 (9th Cir.1996) (inducing witness to testify untruthfully or participating in the proffer of untruthful evidence shows consciousness of guilt) (citing *United States v. Brashier*, 548 F.2d 1315, 1325 (9th Cir.1976) (holding same)); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993) (court has "broad discretionary power" to allow jury to draw adverse inference from destroyed or spoliated evidence); *United States v. Scheibel*, 870 F.2d 818, 822 (2nd Cir.1989) (jury may consider fabrication of exculpatory evidence as proof of consciousness of guilt); *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 675 F.2d 1349, 1357 (4th Cir.1982) (noting that "[p]erjury and fabricated evidence are ev-

ils that can and should be exposed at trial....").

## III. The Clean Elections Act Contribution Form

At trial, Southern Union questioned Irvin about alleged misrepresentations he made on a Qualifying Contribution Form. The Contribution Form is provided by the State of Arizona Clean Elections Commission and is used to document five-dollar contributions toward a candidate's campaign. The candidate needs to gather a certain number of these contributions to qualify for state campaign funding. The Contribution Form presented by SUG at trial indicated that Ken Dickson had given five dollars to Irvin's campaign on May 23, 2002. At the bottom, the Contribution Form requires a certification by the candidate [Irvin] that: "[he], the undersigned, upon [his] oath and under penalty of perjury, [certified] that [he] received a $5.00 contribution from the above contributor, who is to the best of [his] information and knowledge, a qualified elector of this state." Commissioner Irvin signed the Form, however, Ken Dickson stated in an affidavit that he never contributed five dollars to Irvin's campaign.

During Commissioner Irvin's testimony, Southern Union sought to impeach his credibility by questioning him about the Contribution Form. Under examination, Irvin testified that the signature on the Form was his, Tr. 12/6/02 at 4806, that Dickson did not fill out the Form in his presence, *id.* at 4807, and that on May 23, 2002, Irvin "wasn't with him [Dickson]." *Id.* at 4808. Because the Form required a signature by the candidate, under penalty of perjury, the Court allowed questioning of Irvin about the Contribution Form and particularly whether he understood that by signing the Form without personal knowledge of whether the $5.00 contribution was

made by the person named on the Form, he violated the Clean Elections law. *Id.* at 4809–10. During cross-examination, however, Irvin's counsel informed the Court at sidebar that Irvin was told by the a Clean Elections official that he could sign the form even if he did not personally receive the money. The Court suspended the cross-examination on the issue until it was clarified what he was told by the official. The matter was not raised again during Irvin's testimony because counsel reached an agreement that it would not be pursued any further.

■ The evidence that Irvin signed the form under penalty of perjury without appropriate knowledge of the contributor's identity was admissible under Fed.R.Evid. 608(b) to challenge the truthfulness of Commissioner Irvin's testimony. The Ninth Circuit has held that "[e]vidence of prior frauds is considered probative of the witness's character for truthfulness or untruthfulness." *United States v. Gay,* 967 F.2d 322, 328 (9th Cir.1992). *See also United States v. Girdner,* 773 F.2d 257, 261 (10th Cir.1985) ("Appellant placed his credibility at issue when he took the stand. The court did not abuse its discretion in allowing cross-examination of appellant's previous falsehoods and deceitful actions in the ballot fraud scheme as being probative of appellant's truthfulness."). Further, under Rule 403, any unfair prejudice did not outweigh the probative value of the evidence. The credibility of Commissioner Irvin's testimony was an important component of how the jury reached a verdict. While the jury might disbelieve Irvin on this issue, the danger of unfair prejudice was minimal, because the jury was unlikely to find him liable solely because he was found untruthful on this issue in light of the considerable evidence of his false statements on the more serious allegations of his conduct. Further, it is inescapable that his acts in connection with his candidacy were relevant to SUG's argument of his motive to engage in wrongdoing. Plaintiff claimed that Irvin, at the behest of SWG management, participated in the fraudulent and wrongful harm to SUG because he hoped it would promote his political career.

■ Irvin also contended that the questioning was improper because there was evidence that the Contribution Form could be legally signed by Commissioner Irvin without any verification on his behalf that the five dollars actually was contributed by Ken Dickson. Irvin's argument is not persuasive, for at least three reasons. First, Irvin's legal interpretation of his obligation when signing the form conflicts with its plain language, in the first component of the form, requiring that the signer certify "under penalty of perjury" that the five dollars is from the named contributor. In contrast, the second part of the certification merely requires that the signer attest to "the best of [his] information and knowledge" of the electoral qualifications of the candidate. Irvin's interpretation of the first part of the Contribution Form was that it also only required that to the "best of information and knowledge" he knew the identity of the contributor. But the Form expressly requires that the identity of the contributor must be certified "under penalty of perjury."

■ Second, Irvin raised his objections to this line of questioning too late during the trial. Plaintiff indicated that it would provide impeachment evidence concerning the Clean Elections Contribution Forms as early as November 15, and based on the Court's order, timely provided the forms to Irvin's counsel. Only after Irvin was asked about the Contribution Form on December 6, 2002 during cross-examination, did Irvin's counsel spring into action and request a sidebar to argue for the first time that the law validated Irvin's signing of the form without knowing the identity of

the contributor of the $5.00. A lengthy discussion took place concerning whether the plain and unambiguous words on the form could have been disregarded by Irvin. The Court ordered a recess, and precluded further inquiry of Irvin on the subject, until opposing counsel and the Court were apprised by a qualified election official of the correct interpretation of the language on the Form. In order to ensure the Court ruled in his favor on this issue, Irvin should have brought his argument to the Court's attention long before cross-examination began.

█ Finally, Irvin's *post hoc* legal explanation is irrelevant to Irvin's state of mind at the time he signed the form. His counsel's interpretation of the Clean Elections Act was only relevant if Irvin had a subjective belief *at the time of signing the Form,* expressly under penalty of perjury, that he could legally do so. Irvin, however, offered no such evidence. He never testified that this was his belief in May 2002, and in fact, never elaborated on the matter after his counsel's objections. It remains a mystery why all counsel agreed not to further pursue the topic on direct or cross-examination. Irvin had the opportunity to explain the possible discrepancy in signing the Contribution Form, but chose not to offer any explanation.

**IV. Questioning of Irvin relating to the truth of witness testimony**

█ As a final evidentiary matter, Commissioner Irvin was asked at trial about the contents of a conversation he had on April 5, 1999 with Michael Maffie and Thomas Hartley. Irvin's testimony arguably contradicted Maffie's and Hartley's recollection of the 1999 conversation. After both Maffie's and Hartley's testimony was in evidence and Irvin controverted their testimony, SUG counsel inquired of

Irvin, "Did Mr. Maffie and Mr. Hartley lie when they said [to the Board] that you said Southern Union wouldn't pass regulatory approval?" (Tr. 12/5/02 at 4549).[3] Counsel for Irvin objected to Southern Union asking Irvin's opinion of whether another witness had lied, and the Court overruled the objection.

In support of his objection, counsel later cited *United States v. Sanchez,* 176 F.3d 1214 (9th Cir.1999) for the proposition that a witness should never be asked to comment upon the truthfulness of another witness's testimony while on the stand. In *Sanchez,* a criminal defendant gave testimony on the witness stand that arguably conflicted with the testimony of a police officer called as a prosecution witness. The prosecutor then asked the defendant whether he was "telling the ... Jury that [the officer] lied to them?" *Id.* at 1219. The Court held that "the prosecutor's questions compel[ing] Sanchez to give his opinion regarding the credibility of a deputy marshal ... was error." *Id.* at 1220.

*Sanchez,* however, did not hold that asking a witness to provide such an opinion is categorically improper. On the contrary, *Sanchez* and the cases upon which it relies are all criminal cases, where the credibility of the criminal defendant was absolutely essential to his defense but was challenged by questions regarding the truthfulness of another witness's testimony. *See, e.g., United States v. Sanchez–Lima,* 161 F.3d 545, 548–49 (9th Cir.1998) (bolstering of prosecution witness's testimony improper where "jury's verdict necessarily depended on the credibility of the bolstered witness"); *United States v. Geston,* 299 F.3d 1130, 1136 (9th Cir.2002) (questioning improper where prosecution required witnesses to "offer opinions regarding the veracity of the government's witnesses").

---

**3.** Irvin responded, "I'm not saying that they lied at all, Mr. Herschmann," and later added, "I don't recall what transpired in that conversation."

In those cases, the determinations of truthfulness and credibility also directly pertained to the ultimate issue, guilt or innocence, to be decided by the jury, and a defendant's opinion whether law enforcement agents were more truthful than the defendant is often substantially prejudicial. As many courts have recognized, the propriety of such a question may depend on the context in which the question is asked. *See State v. Morales,* 198 Ariz. 372, 376, 10 P.3d 630, 633 (Ariz.App.2000) (also a criminal case, declining to adopt a bright line rule prohibiting or allowing such a question and noting, "[d]espite those concerns, 'were they lying' questions may not always be improper"); 29 Wright & Gold, *Federal Practice and Procedure* § 6255 n. 19 ("On the other hand, the balance shifts in the direction admitting lay opinion as the distance increases between the opinion and the ultimate issues."). As the Arizona Court of Appeals stated in *Morales,* "such questions may be appropriate when the only possible explanation for the inconsistent testimony was deceit or lying." *Morales,* 10 P.3d at 633.

In this case, the questioning of Commissioner Irvin served merely to illustrate the inconsistency of his testimony with that of Maffie and Hartley whose testimony on material issues was also inconsistent. Perhaps a less pejorative characterization of the opinion as a "lie," such as, "less than truthful," would have been preferable. The jury, however, remained free to determine whose testimony it would credit. Moreover, unlike in a criminal trial, the ultimate issue of wrongfulness, did not turn on the opinion of Irvin regarding whether he believed Maffie and Hartley were truthful. Moreover, unlike the defendant in *Sanchez,* Irvin was not prejudiced by being asked to impugn the credibility of government witnesses, who, despite an instruction otherwise, are often accorded more credibility because they are law enforcement officers. Rather, Irvin was asked to comment on the credibility of witnesses who, as Southern Union alleged, were actually co-venturers in the joint venture to block SUG's proposed merger.

## V. Irvin's Motion for JNOV or New Trial

At a hearing on June 2, 2003, the Court denied Commissioner Irvin's Motion for a Judgment Notwithstanding the Verdict under Fed.R.Civ.P. 50(b), and a new trial under Fed.R.Civ.P. 59 [4] [Doc. # 2238]. Under Rule 50, the Court may grant Irvin judgment as a matter of law, if the "evidence construed in the light most favorable to the nonmoving party permits only one reasonable conclusion, and that conclusion is contrary to the jury's." *Vollrath Co. v. Sammi Corp.,* 9 F.3d 1455, 1460 (9th Cir.1993). Another way to formulate this standard is that the verdict of the jury must be upheld unless there is no "substantial evidence" to support the jury's verdict. *Landes Construction Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1371 (9th Cir.1987). Also, the Court may order a new trial under Rule 59 when the verdict is against the clear weight of the evidence. *Id.*

Irvin first contends that Southern Union did not prove that he was the "but for" cause of the injury on both claims of liability. To prove the interference with contract claim, Southern Union had to prove that Irvin interfered with its Standstill Agreement by causing Southwest Gas to unfairly evaluate Southern Union's merger proposal. Under the interference with business relations claim, Southern Union had to prove that Irvin was the "but

---

4. The Court took under consideration Irvin's motions regarding the punitive damages award of $60 million, and issued an opinion on that matter on July 31, 2003.

for" cause of the termination of the business relationship.

In his Motion, Irvin repeats a number of arguments capably presented to the jury at trial. First, Irvin argues that Southwest Gas never had any intention of considering the Southern Union offer in good faith, and therefore Irvin was not the "but for" cause of the breach of the Standstill Agreement. Second, Irvin argues that all members of the Southwest Gas Board testified that Irvin's letter and phone call were not factors in their decision to reject the proposed merger. Also, Irvin points out that the Board was presented with significant additional evidence disparaging Southern Union that sealed the rejection of Southern Union's offer without Irvin's interference in the decision.

As Southern Union points out, the Court already found sufficient evidence presented on summary judgment and repeated at trial that the Southwest Board was initially favorably inclined toward Southern Union, but became concerned after Irvin's letter and taped telephone call were disclosed to the Southwest Board. *Southern Union Co. v. Southwest Gas Corp.*, 180 F.Supp.2d 1021, 1055 (D.Ariz.2002). Southern Union also presented evidence at trial that Irvin's interference, keyed in part by his status as a regulator, was essential to the success of Maffie's efforts to sway the Southwest Board to reject the proposed merger. The jury was entitled to believe this evidence and disbelieve the arguably self-serving testimony of other members of the Southwest Board who claimed to have rejected the proposed merger on the basis of other concerns, many of which were raised in depositions after Southwest Gas and the Board members were named as parties in this lawsuit. Significantly, the jury could have relied on the most relevant testimony of Manuel Cortez, a Board member, who was deposed along with Maffie's testimony *after* the SWG stockholders sued SWG for

rejecting Southern Union's merger application but *before* Southern Union sued SWG. He and Maffie pointedly emphasized in their earlier depositions the importance of Irvin's letter and taped statement in the final decision of the Board to reject SUG as a merger partner.

 Next, Irvin again argues that his actions were not improper, because they were legally engaged in according to his duties as a Corporation Commissioner. Again, this argument is substantially unavailing. Merely because Commissioner Irvin was vested with statutory powers as a Corporation Commissioner did not afford him legal immunity from using these powers improperly. At trial, Southern Union presented material evidence that Irvin's conduct was improper, particularly through the testimony of Judy Sheldrew and Gregory Patterson, who represented Arizona consumers as Director of the Residential Utility Consumer Office (RUCO) during the time of the merger, in conjunction with the inconsistent testimony of Maffie, Hartley, and Board member Cortez. Unequivocally, Corporation Commissioners have the power, and in some matters the duty, to thoroughly investigate proposed merger candidates, but they must do so neutrally, fairly, and without a preconceived animus against one candidate, and personal bias and aggrandizement in favor of another. Moreover, the Commissioners are to eschew any effort to improperly influence their decisions. The evidence permitted the jury to find that the impropriety was easily inferred from Irvin's efforts at concealment of his activities, including the shredding of documents, the lack of a record of Irvin's travel plans, and evidence that he fabricated trial evidence. The evidence was sufficient for the jury to find improper conduct.

Finally, Irvin argues that Southern Union provided no evidentiary basis for con-

cluding that Irvin knew of the Standstill Agreement, which is a necessary element for the interference with contract claim. The Court ruled on summary judgment that there was sufficient evidence to find that Rose knew of the Agreement and the prospective business relationship, which evidence was presented at trial. *Southern Union,* 180 F.Supp.2d at 1053. Further, the jury could infer Irvin's knowledge of the Agreement from Irvin's numerous interactions with Rose after the Agreement was signed, his very close relationship with him, and from Irvin's later efforts at concealment of his knowledge. Again, the jury was entitled from the evidence to discredit Irvin's testimony to the contrary.

For these reasons, Irvin's Motion for Judgment Notwithstanding the Verdict and for a New Trial were denied.