*Stewart SILENTMAN*
Petitioner-Appellant
*vs.*
*PITTSBURG AND MIDWAY COAL MINING COMPANY*
Respondent-Appellee
In the Supreme Court of the Navajo Nation

No. SC-CV-12-00

June 25, 2003

Daniel M. Rosenfelt, Esq., Albuquerque, New Mexico, for Appellant.

Lynn Isaacson, Esq., Gallup, New Mexico, for Appellee.

Before YAZZIE, Chief Justice, and KING-BEN and G. BENALLY, Associate Justices.

Opinion delivered by YAZZIE, Chief Justice.

This appeal requires us to review a decision of the Navajo Nation Labor Commission (Labor Commission) on the Navajo Preference in Employment Act (NPEA) claims of Stewart (Silentman), a Navajo. We affirm the Labor Commission's decision and issue this opinion to clarify the standard of review on appeal and its application to this case.

In its decision, the Labor Commission concluded that (1) Pittsburg and Midway Coal Mining Company did not violate NPEA, 15 NNC §604 (C)(2), when P&M laid off Silentman and retained non-Indian production supervisors, (2) P&M's establishment of written qualifications for each employment position did

not violate NPEA; and (3) P&M did not violate NPEA by not rehiring Silentman.

Silentman was employed with P&M at its McKinley Mine from February 21, 1978, through September 30, 1996, a period of approximately 18.5 years before he was laid off.[1] Until 1981, Silentman worked as a "represented worker" and was subject to the provisions of the collective bargaining agreement.[2] On March 16, 1981, was hired as a "non-represented" supervisor. In 1996, Silentman was involuntarily separated his position and received a $42,100 involuntary severance package.

During his employment with P&M, Silentman received periodic reviews of his work and skills.[3] As early as 1990 and each subsequent year, Silentman was advised to improve his skills in the areas of aggressiveness and assertiveness, attributes considered essential for supervisors. In 1991, he "displayed a lack of confidence in his own abilities," which affected his ability to perform "adequately" as a production supervisor. In 1992, he was advised to correct supervisory deficiencies. His shift, or working group, consistently failed to perform at the same level as other shifts at McKinley Mine. In 1993, Silentman was told his "status quo attitude" made him the "weakest link" in the production supervisor chain. In 1994, he was involuntarily reassigned to the utility supervisor position because of his inability to perform at an acceptable level. In 1995, Silentman's job performance improved "slightly," but his supervisor found he was still not performing at an acceptable level. Supervisory employee salaries were set and adjusted annually with a merit pay increase based upon ability to meet performance objectives. Silentman did not receive increases in 1994 and 1995 because he could not adequately perform his duties. In 1996, reduced coal sales prompted a reduction in work force at McKinley Mine, resulting in Silentman's lay off. P&M formed a "Force Ranking Committee"to determine which mine production supervisors would be retained. Fourteen mine production supervisors, including Silverman, were evaluated on the basis of job knowledge, teamwork, adaptability, leadership, planning, communication and demonstrated technical skills. Based on the finding that Silentman was ranked the "poorest performing production supervisor" of all supervisors, he lost his job. At Silentman's departure, he executed a General Release and Waiver in which, among other things, he agreed not to make any claims arising from his employment termination with P&M, specifically any claims arising under NPEA. Silentman claimed P&M told him that he would be hired for a position he qualified for "when economic conditions changed and production increased."

1 He held several different jobs throughout his employment, including driller helper, shooter, pit supervisor, production supervisor, loading supervisor, utility supervisor, and truck/shovel supervisor.

2 Collective bargaining agreements prohibited Silentman from operating mining equipment or performing the duties of represented employees when he served as a supervisor.

3 He was rated using "key job responsibilities" and "performance dimensions" in an annual performance evaluation worksheet.

P&M advertises job vacancies in local and regional newspapers and radio stations with announcements stating the qualifications and experience required for applicants. There are written job descriptions available to applicants for all non-represented positions, and the duties of represented positions are defined in collective bargaining agreements. P&M hired three Navajo production supervisors in 1997 whom the Labor Commission affirmatively found were "the most qualified Navajos who applied."

Although Silentman submitted applications since 1997 for several positions, he was not interviewed or rehired for any position.[4] P&M submitted testimony that before February 1998, Silentman was not qualified for the positions of blasting specialist, shooter, driller, truck driver, dozer operator, front-end loader operator, maintenance supervisor, production supervisor, utility maintenance planner, safety supervisor, or dragline supervisor.

Prior to February 1998, Department of Human Resources screened applications based upon the information provided. Consequently, if an applicant failed to adequately list his or her experience, training, or qualifications, the application was automatically disqualified for further consideration. Silentman's applications for rehire did not adequately describe his experience, training, or qualifications, except when he described his position as production supervisor.

Under new procedures, each applicant's skills and qualifications are quantified using an objective scoring system to assign a percentage rating. To earn an interview, the new procedure required applicants to score 80% of all job skills required for a position. P&M presented testimony by Silentman's former supervisor that Silentman did not meet 80% of the qualifications for production supervisor or for other positions he sought. P&M's employment policy and the collective bargaining agreements state that an applicant for a represented or non-represented job "must be able to immediately perform all required job duties, without the need for additional training."

## I

The Labor Commission made general conclusions of law to which it applied its findings of fact in making its determination. The Labor Commission applied the preponderance of the evidence standard in its decision. It recited requirement that, in the event of a reduction-in-force, any Navajo or candidate who shows the required qualifications for an employment position must be retained in preference to any non-Navajo applicant or candidate. 15 NNC §605 (C) (1) & (2), (1995). The Labor Commission also recited NPEA's requirement that there be written job qualifications for all employment positions, and copies of them

4 In January 1997, Silentman applied for the jobs of production supervisor, driller, shooter, truck driver, and front end loader/operator. In July of that year, he applied to be a blasting specialist. In August and September of 1997 and March 1998, he submitted additional applications for the positions of utility supervisor, mechanics supervisor, production supervisor, and maintenance supervisor.

must be provided to applicants or candidates. 15 NNC §604 (D), (1995). The Labor Commission noted requirement that among the pool of Navajo applicants or candidates who meet the necessary qualifications, the Navajo with the best qualifications must be selected or retained. 15 NNC §604 (C) (3) (1995). Based upon these conclusions, the Labor Commission concluded that Silentman's lay-off during the 1996 reduction-in-force did not violate NPEA in either retention or rehiring, and P&M did not violate NPEA'S requirements for establishing written qualifications.

Silentman contends there are facts that defeat the Labor Commission's conclusions of law. He argues that P&M violated NPEA by (1) retaining non-Indian supervisors when the reduction-in-force was made; (2) not having or disseminating written qualifications for the positions he sought; and (3) not showing that it hired the best qualified Navajos for positions that were open. Silentman further contends that (1) the pleadings should be deemed amended to conform to the evidence showing that non-Navajos were hired as supervisors; (2) the waiver P&M relied upon was invalid; and (3) this appeal addresses errors of law only and does not dispute the facts.

## II

In analyzing the case before us, we must first decide the exact standard and principles for reviewing the findings of fact of quasi-judicial agencies and bodies in the Navajo Nation.

To clarify the standard of review, we note the parties agree that this Court's review "is limited to determining whether the Commission's decision was arbitrary, capricious or not supported by the evidence. Only if there was clearly an abuse of the Labor Commission's discretion will it be overturned." *Largo v. Gregory Cook*, 7 Nav. R. 111, 119 (Nav. Sup. Ct. 1995). While the rule is quoted correctly, it is not precise enough for our purposes, and it is time to clarify it. The Navajo Nation rule closely tracks the standards for judicial review of decisions made pursuant to the Federal Administrative Procedures Act (APA) as set out in 5 U.S.C. §706. In the case of *Dickinson v. Zurko*, 527 U.S. 150 (1999), the U.S. Supreme Court established "a uniform approach to judicial review of administrative action," and upheld the APA's review standard that an agency decision will be upheld on appeal if it is "supported by substantial evidence" agency adjudications.

For the same considerations of uniformity we adopt a more precise standard of review of decisions made by a Navajo Nation agency and quasi-judicial tribunal. The traditional judicial review principles used by the federal courts can be summed up by four simple questions; namely, "Is a finding of fact right? Is it wrong? Is it unreasonable? Is it irrational?" *SSIH Equipment v. United States International Trade Commission*, 718 F. 2d 365, 3799-83 (Fed. Cir. 1983). The proper standard for the review of agency determinations is the third question and may be stated as whether they are "supported by substantial evidence." *Id.*, and

*Dickinson, supra.* We adopt the rule that "supported by substantial evidence" means relevant evidence which a reasonable mind could accept as adequate to support the conclusion, even if it is possible to draw two inconsistent conclusions from the evidence. *Landes v. Royal*, 833 F. 2d 1365, 1371 (9th Cir. 1987). We will review findings of fact to see if the record reasonably supports them. When there are two possible conclusions that may be reached on the record, we will give due deference to the Labor Commission as a fact finder so long as a reasonable mind could support the factual conclusions it reaches. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). Silentman asks us to declare that the shortcomings he identifies in reference to the record are errors of law that justify a less deferential standard of review. We decline to do so. Our inquiry will be limited to whether the Labor Commission made reasonable findings of fact and drew reasonable inferences from the record.

### III

With the proper standard established, we analyze Silentman's three main factual findings. Silentman first points to the retention of supervisors as a result of the reduction-in-force. The Labor Commission correctly identified the requirement that a Navajo must first show he or she has the necessary qualifications for retention or hiring before being compared to other employees. There is substantial evidence to support the Labor Commission's factual finding that Silentman was not qualified for either retention or rehire. Evidence suggested that Silentman was not able to perform at an acceptable level as a production supervisor. P&M's hiring of non-Indian supervisors during the reduction-in-force is thus not relevant because the evidence supports the Labor Commission's findings on Silentman's lack of qualifications.

Silentman's second contention is that P&M did not have written qualifications on the positions for which he applied. Evidence showed that P&M advertises job vacancies in local and regional newspapers and radio stations with announcements stating the qualifications and experience required for applicants. The duties of represented positions are defined in collective bargaining agreements, and there are written job descriptions available to applicants for all non-represented positions. The Labor Commission reasonably found that P&M had adequate job descriptions was reasonably supported by this evidence.

Silentman's last contention raises the question of whether the most qualified Navajos were hired for positions for which he applied. Before proceeding to a comparative analysis of the qualifications of various Navajos who applied for a job, an applicant must first show that he or she is actually qualified for the position. P&M provided evidence that Silentman was not qualified for the jobs he applied for. The Labor Commission's decision was therefore reasonable. We also uphold the Labor Commission's finding that there was no retaliation for Silentman's previous grievance for not being hired in 1994 as a dragline

supervisor. Silentman apparently produced no evidence to prove this claim of retaliation. The Labor Commission is therefore supported by the evidence in the record that retaliation was not the cause of P&M's employment actions.

We find that the Labor Commission's decisions were all reasonably supported by the record. There is no need to address the waiver of claims argument because the Labor Commission did not rely on it in its decision, instead addressing the merits of the case.

P&M urges the court to create special exceptions because of provisions in its lease that appear to give it greater latitude in employment decisions than other employers. However, the Navajo Preference in Employment Act applies equally to all employers. *Arizona Public Service Co. v. Office of Navajo Labor*, 6 Nav. R. 246, 261 (Nav. Sup. Ct. 1990). We will not carve out special exceptions for lessees, unless the Navajo Nation Council expresses clear intent that standards are different for some and there are justifiable reasons for the action. When we interpret laws, the standards must be the same for all to the greatest extent possible.

Finally, we note that Silentman makes broad assertions about what the record says, but does not clarify his arguments with details from the record, either quoted in his brief or given to the court in an appendix. When the factual record is part of the basis for an appeal, counsel has the obligation to this Court to lay out the facts in detail.

The Navajo Nation Labor Commission is hereby AFFIRMED.